# UTAH FOUNDRY & MACHINE COMPANY v. UTAH GAS & COKE COMPANY.

No. 2396. Decided December 20, 1912. Rehearing denied April 30, 1913 (131 Pac. 1173).

1. TROVER AND CONVERSION—BURDEN OF PROOF. Where defendant. set up as a counterclaim its right to compensation for scrap iron which it claimed had been converted by plaintiff, defendant has the burden of proving the conversion and the amount of iron converted. (Page 540.)

2. TRIAL—INSTRUCTIONS—BURDEN OF PROOF. Where a defendant. set up as a counterclaim plaintiff's conversion of scrap iron, which was denied by plaintiff, who introduced evidence in support of the denial, an instruction that if the jury found part of the moneys paid by plaintiff to defendant's agent was for scrap iron wrongfully sold, but were unable to determine the exact. amount, the amount so paid being peculiarly within the knowledge of plaintiff, the jury might, in the absence of any showing, assume that all moneys paid to defendant's agent were for that purpose, is erroneous and prejudicial because casting on plaintiff the burden of proof which was on defendant. (Page 540.)

3. EVIDENCE—PRESUMPTIONS—INFERENCES UPON INFERENCES. Inferences cannot be bottomed upon inferences and an instruction upon defendant's counterclaim for conversion of scrap iron, which allowed the basing of inferences upon inferences by assuming wrongdoing by plaintiff, is erroneous. (Page 544.)

4. EVIDENCE—ADMISSIONS—ADMISSIONS BY AGENT. To bind his principal, an admission by an agent must be made within the scope of his employment and during the transaction of business. by him; therefore, a statement or declaration by the secretary and bookkeeper of a corporation, long after the transaction, as to the purposes for which checks were given is not binding on the corporation as an admission. (Page 545.)

5. TROVER AND CONVERSION—ACTIONS—EVIDENCE. Evidence *held* insufficient to sustain a finding in favor of defendant who by counterclaim set up plaintiff's conversion of scrap iron. (Page 545.)

6. APPEAL AND ERROR—REVERSAL—REMAND. Where defendant admitted plaintiff's demand, and set up a counterclaim for conversion, a judgment in favor of defendant, which is not sustained by sufficient evidence, will be reversed without remanding for new trial; it appearing that the judgment was rendered in obedience to an erroneous instruction on the burden of proof,.

and that in a former trial, where the evidence was the same and no such instructions were given, verdict was for plaintiff. (Page 547.)

APPEAL from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Action by the Utah Foundry and Machine Company against the Utah Gas & Coke Company, which counterclaimed.

Judgment for defendant for difference between amount of its counterclaim and plaintiff's demand. Plaintiff appeals.

REVERSED AND REMANDED WITH DIRECTIONS.

*Geo. M. Sullivan* for appellant.

*Stephens, Smith & Porter* for respondent.

STRAUP, J.

The plaintiff brought this action to recover a balance of $285, alleged to be due for goods and supplies, consisting of iron castings, sold and delivered to the defendant. The defendant, in its answer, admitted the alleged claims and the amount due. By way of counterclaim it alleged in the first count that, in purchasing goods and supplies by the defendant from the plaintiff, one Wright, the agent of the defendant and acting for it in the making of such purchases, had entered into a conspiracy with the plaintiff whereby the goods were purchased at an excessive price, and the excess paid by plaintiff to Wright, and that in furtherance of such conspiracy the plaintiff in such transactions overcharged the defendant in the sum of $200. In the second count the defendant alleged that between the 1st day of August, 1906, and the 1st day of August, 1907, it was the owner and lawfully possessed of certain "cast-iron piping" —scrap iron—of the value of $300, and that "on divers

dates between said dates, the exact date this defendant is unable to give, the plaintiff, at Salt Lake City, Utah, unlawfully took and carried away said goods to wit, said iron piping and converted and disposed of the same for its own use to the damage of this defendant in the sum of $300." The counterclaim was denied. The case was first tried in the city court. From a judgment in favor of the plaintiff on its complaint for the full amount sued for, the defendant appealed to the district court. There the case was tried three times before the court and a jury. In the district court the defendant abandoned the first count of its counterclaim. So each time the case was tried it was tried solely on the issues presented by the counterclaim in respect of the alleged thefts and conversion of the defendant's scrap iron by the plaintiff. The first trial resulted in a verdict in favor of the plaintiff for the full amount sued for. The second was a mistrial resulting in the discharge of the jury without a submission of the cause to them after the evidence had all been adduced, the parties had rested, and arguments to the jury partially made. The third resulted in a verdict in favor of the defendant on its counterclaim in the sum of eight dollars in excess of plaintiff's claim. From that judgment the plaintiff has appealed. The evidence and proceedings had on the first and last trials in the district court and the substance of the second are preserved by a bill of exceptions and made a part of the record on appeal. Numerous errors are assigned. We find it necessary to consider but two of them: Those relating to the charge, and insufficiency of the evidence to support the finding on the counterclaim.

The defendant was engaged in manufacturing and furnishing gas in Salt Lake City; the plaintiff in a foundry business. In support of the thefts and conversions alleged in its counterclaim, the defendant called but one witness, its superintendent of distribution, who, in substance, testified: At the time in question the defendant was laying about sixty miles of gas mains along the streets of the city. It furnished its own material. The work was done under

contract by Hanly & Ritchie. Piping and other material were delivered at railroad sidings for the contractors who hauled and scattered the piping and material along the streets were trenches had been dug and where they remained until put in the trenches. The plaintiff, at the defendant's request, furnished the defendant cast-iron goods and supplies used by it in the prosecution of the work. In the laying of the pipe and in the construction of the work, scraps and pieces of pipe and other material resulted, which were "left lying around on the job until they were disposed of." The witness further testified that among other duties it also was his duty to superintend the laying of the gas mains. He attended to the hauling of the material, the keeping of plenty of pipe ahead for the contractors, and the making of estimates on which the contractors were paid. The defendant also had in its employ one W. O. Wright, who was foreman of the inspectors. It was his duty to inspect the work, to supervise and control inspectors under him, and to see that the work was done in accordance with the contract. There was no one charged with the duty of looking after the scrap iron scattered along the streets after the mains had been laid; but the witness and Wright both looked after it and both jointly attended to it. The witness further testified that in the construction of the work throughout the city the defendant during the prosecution of the work, and after the mains had been laid, lost about forty tons of scrap iron so left scattered along the streets. He largely arrived at this estimate by ascertaining from the books of the defendant the amount of gas pipe and other material purchased by it; by ascertaining from the books the amount of gas pipe and other material placed underground; and by subtracting the latter amount from the former. He also testified that on several occasions he directed employees of the defendant to gather some of the scrap iron and that he caused some of it to be delivered to plaintiff. But he did not testify how much he caused to be so gathered or delivered to it. He, from vouchers rendered by the plaintiff, testified that it at different times had received about

seven tons and 1572 pounds of scrap iron, which, at the
market price of one cent a pound, amounted to $155.72;
but that the defendant was given full credit and was paid
therefor.  He did not testify, nor did any other witness,
that Wright had no authority to sell scrap iron of the de-
fendant, but testified that Wright had no authority to sell
scrap iron "on his own account."

Robert Croft, Jr., who owned about 4900 shares of the
capital stock of 10,000 shares of the plaintiff, was the pres-
ident and general manager of the plaintiff corporation.  His
father, Robert Croft, Sr., seventy-three years of age and
owning thirty shares, was its secretary, bookkeeper, and
collector.  Fred Croft a son of Robert Croft Sr., and a
stockholder of the company, had a personal controversy with
the plaintiff over matters between him and it.  He consulted
an attorney about it, the same attorney who represented the
defendant in this litigation.  Fred took from the private
papers of the plaintiff a returned check which had been
issued by the plaintiff to Wright for fifty-six dollars, and
indorsed by him, and the stub from which the check had
been detached and delivered them to the attorney.  It is
not made to appear that they had anything to do with his
controversy.  The stub, when it was delivered to the de-
fendant's attorney by Fred, had written on it the words "for
iron and commission."  This, with Fred's consent, was com-
municated to the general manager of the defendant and
the check and stub shown him.  His suspicions were aroused
that Wright had some kind of dealings with the plaintiff in
which money was paid him, and that he had failed to ac-
count to the defendant for it.  Thereupon he directed the
witness, the defendant's superintendent of distribution, and
his stenographer, to visit the Crofts and interview them.
They visited the plaintiff's place of business and there found
Croft, Sr., alone.  Among other things the witness said
to him:  "Information has reached us to the effect that
Wright sold scrap iron to you."  As testified to by the wit-
ness, Croft first denied it; then he said that Wright had
sold him scrap iron, but he presumed that he was an employee

of the gas company; that he paid him, and presumed that he had paid it to the gas company. The witness asked him how Wright delivered the iron to him. He answered that Wright called him up and asked him to send a team to certain places to collect scrap iron. The witness told Croft that "it was peculiar that he would take that kind of an order from Wright when previous orders, any time he had been ordered to collect scrap iron by the company, came directly from him (the witness) or else the iron was hauled to him (Croft) by our teams or hired teams." The witness atked Croft how he had paid Wright. He said by checks. He was asked if he had any other transactions with Wright and he said that he had not. The witness then asked permission to look over the papers, checks, stubs, and books of the plaintiff. He and his stenographer were given liberty to do so. About that time Robert Croft, Jr., appeared at the office. Both he and his father assisted the witness and his stenographer in gathering up and getting all the returned checks and stubs and all books and papers pertaining to plaintiff's business. The witness and his stenographer found four returned checks which had been issued to Wright by the plaintiff. He testified that he and his stenographer compared the checks with the stubs and that on at least one of them found written or noted "for commission," not for iron, and testified that he could not remember what notation or words were on the other stubs. The witness showed Croft two checks and asked permission to take them. The permission was granted. They took the two and clandestinely two others. Later all the checks taken were returned to the plaintiff, including the check and stub which Fred had taken. At the trial the defendant called for all the checks which the plaintiff had issued and given to Wright. The plaintiff produced five. It was unable to find or produce the check or stub which Fred had taken and which had been returned to the plaintiff. The five checks were put in evidence. Evidence was given of the notation on the missing stub and the contents and amount of the missing check. The other stubs were not called for and were not offered in

evidence by the defendant. The six checks amounted in the aggregate to $277.45, all payable to Wright and issued by the plaintiff and indorsed by Wright. While the witness testified that Croft, Sr., first denied receiving any iron from Wright, then admitted receiving some, and afterwards "told a different story," again denying it, still the witness did not testify that Croft stated any amount of Iron so received by him from Wright.

This, in substance, is all the evidence adduced by the defendant in support of its counterclaim that the plaintiff at divers times "unlawfully took and carried away" iron belonging to the defendant "and converted and disposed of the same for its own use."

Two witnesses testified on behalf of the plaintiff, Robert Croft, Sr., and Robert Croft, Jr. They denied that they or the plaintiff had received any iron from Wright or the defendant, except the seven tons and 1572 pounds for which admittedly the defendant was given credit and was paid. They testified that when the defendant began its construction work it was purchasing foundry supplies from other foundries in the city. Thereafter Wright called on the Crofts and told them that he was in a position to give the plaintiff orders for supplies and that he could throw a good deal of work to it; but, if he did, he thought he should be entitled to a commission on the amount of goods sold by plaintiff to the defendant. After negotiating back and forth as to the rate the plaintiff finally agreed to give him ten per cent. Thereafter the plaintiff received orders from the defendant for foundry supplies and furnished to the defendant in all about $3300 worth, for which plaintiff was paid in full by the defendant, except the balance sued for of $285. When the last check was issued to Wright, the amount so sold and delivered was about $2580. The Crofts further testified that the checks issued by plaintiff and delivered to Wright were all in payment, not of scrap iron, but of commissions. Croft, Sr., who wrote the checks, testified that the stub after it had been taken by Fred and when it was returned to the plaintiff had on it the words "for iron

and commission;" but that the word "iron" was not in his (Croft, Sr.'s) handwriting, and was not written on the stub when the check was issued, and was not on the stub when it was taken from the plaintiff's possession, and in effect testified that some one wrote the word "iron" on the stub after Fred had taken it and before it was returned. The plaintiff offered in evidence the stubs of the other checks, all of which had on them the notation or memorandum "for commission," not for iron. The offer was supported by the testimony of Croft that he had personal knowledge of the fact so stated; that the notation or memorandum was made on each of the stubs by him at the time the checks were written and detached therefrom and delivered to Wright; and that they were made in the regular and due course of business. Upon defendant's objections, the offer was by the court refused.

Upon these issues and upon this evidence the court instructed the jury to find for the plaintiff on the issues presented by the complaint for the full amount sued for, together with interest. Upon the issue presented by the counterclaim, the court charged:

(5) That "in order to establish defendant's counterclaim the burden is on the defendant to prove by a preponderance of the evidence the amount of cast-iron pipe, if any, belonging to the defendant that the plaintiff unlawfully took or carried away, if any, and, second, the reasonable market value thereof."

The court also charged:

(6) That if the jury from a preponderance of the evidence, found that Wright "delivered to plaintiff cast-iron piping, the property of the defendant, and that plaintiff had not given defendant credit on its account for the same, then the court instructs you that you must find for the defendant on the counterclaim for the reasonable market value of such cast-iron piping."

The court further charged:

"(8) If you find from a preponderance of the evidence that at least part of the moneys paid to Wright by the

plaintiff company was paid for scrap iron of the defendant company wrongfully sold to the plaintiff company by said Wright, but you are unable to determine definitely the exact amount so paid, then you are instructed that it is peculiarly within the knowledge of the plaintiff company as to just how much was paid for scrap iron, if any, and how much was paid as commission, if any, and within plaintiff's power to explain and show definitely the amount for each; and you have the right, in the absence of any such showing and explanation, to assume, if under all the circumstances of the case you find it is a fair assumption, that all of said moneys so paid to Wright were paid to him for scrap iron, and you may resolve reasonable doubts as to the amount, if any, of such scrap iron so sold to the plaintiff most strongly against the plaintiff company. It is the policy of the law not to permit a wrongdoer to profit by his own wrongdoing; but, before you can apply this principle, you must believe from a preponderance of the evidence that the plaintiff company was in fact a wrongdoer and actually received from Wright scrap iron wrongfully taken by Wright from the defendant company."

The proposition as to burden of proof, and as stated in paragraph five of the charge, was correctly stated. Let it also be assumed that the proposition as stated in paragraph six, if within the allegations of the counterclaim, was also correctly stated. But the propositions and principles stated in paragraph eight are, we think, erroneously stated. The court apparently had in mind the principle applicable to proceedings to reclaim or to recover the value of property wrongfully, fraudulently, or negligently commingled or confused with other property of like character, and where, because of such commingling or confusion by a wrongdoer, the property or its value sought to be reclaimed or recovered was not capable of identification. And on that theory does the respondent defend the charge. Hence cases are cited that, where one fraudulently or wrongfully or negligently commingled or confused property of another with that of his own of like character, the burden is on him to designate

or point out his own property or to show the quantity or
the amount thereof. And, in the absence of such a showing
by him, the wrongdoer may be held to a forfeiture of his
own property, or the jury justified in finding in favor of
the innocent wronged party the highest proved price and the
largest proved quantity of his property shown to have been
commingled or confused by the wrongdoer. We do not see
how this doctrine can properly be applied here.

No claim was made nor is there any evidence to support
the claim that the plaintiff commingled or confused defend-
ant's property with plaintiff's. The charge is that the plain-
tiff unlawfully took and carried away property belonging
to the defendant and converted it. That allegation was de-
nied. Upon that issue the defendant had the burden of
proof. That burden did not shift. It was upon the de-
fendant when the case opened, so continued throughout the
trial, and so remained when the evidence closed and the case
let to the jury. There can be no doubt of that. And so
the court charged in paragraph five. But in paragraph
eight the court wholly destroyed it. Nor can the charge
be justified on the theory of particular facts resting peculiarly
within the knowledge of the plaintiff. It cannot be said
that the alleged facts that the plaintiff unlawfully took and
carried away property belonging to the defendant rested
peculiarly within the knowledge of the plaintiff. The de-
fendant made the charge and it was required to prove it.
As has been seen, the defendant adduced no evidence that
the plaintiff wrongfully or unlawfully took and carried away
any iron belonging to the defendant. Neither did it show
that Wright wrongfully or unlawfully took a pound of its
iron, or wrongfully or unlawfully sold or delivered any to
the plaintiff. Neither did the defendant otherwise prove
that the plaintiff wrongfully or unlawfully came into posses-
sion of a pound of the defendant's iron, or that it received
any iron from the defendant for which the defendant had
not been given full credit. It did show that the plaintiff
received seven tons and 1572 pounds of the defendant's iron,
but at the same time also proved that it was fully paid for

that. The defendant, however, sought to have the infer-
ence drawn that the plaintiff wrongfully received additional
iron from Wright, based on the transactions of the plaintiff
with Wright in respect of the checks, and of the admissions
of Croft, Sr. The checks issued by plaintiff to Wright
and indorsed by him, did not, on their face, disclose what
they were given for. As tending to show that, the defend-
ant was permitted to put in evidence the admissions of
Croft, Sr., which were to the effect that he had received
iron from Wright; that he paid him for it by checks; and
that he had no other dealings or transactions with him. But
the making of such a claim and the adducing of such evi-
dence in no sense shifted the burden of proof. The burden
of proof, even as to particular facts, lies on him who wishes
the court to believe in their existence. If the defendant
desired the court and the jury to believe that the checks were
given for iron which the plaintiff had wrongfully received
from Wright, it had the burden of proving such fact. It
advanced it, asserted and claimed it, and, to justify the
court and jury to believe such was the fact, the defendant
was required to establish it. It could not merely assert it
and then require the plaintiff to disprove it. The plaintiff
denied that the checks were given for any such purpose. Its
witnesses testified that the checks were given, not for iron,
but for commissions; that the plaintiff received no iron
whatever from Wright; and that no part of the checks were
given for any such purpose. But as to that fact, and upon
the evidence adduced by it, the defendant contended that all
of the checks were given to Wright for iron; the plaintiff,
on the evidence adduced by it, that all of the checks were
given for commissions. Neither the plaintiff nor the de-
fendant contended that a part of the checks were given for
iron and a part for commissions.

The charge (paragraph eight), with respect to this ques-
tion, not only contains wrong principles as to the burden
of proof, but is also erroneously bottomed on inferences
upon inferences, on assumptions of wrongdoing by the plain-
tiff and a want of explanations by it in utter disregard of

its evidence, and is but an argument on the theory and on behalf of the defendant. While the court, of course, did not intend it as such, nevertheless that is the effect of it. Notwithstanding the plaintiff by its evidence had denied that any part of the checks was given for iron, that it had wrongfully received any either from Wright or the defendant, or had converted any, and upon its theory fully explained the transactions had with Wright and the defendant, which, as explained by it, showed it not to be a wrongdoer and not guilty of a conversion, nevertheless the court cast on the plaintiff the burden of explaining such transactions on the defendant's theory that the checks or some of them were given for iron, that the plaintiff was a wrongdoer, and that it was guilty of some kind of a conversion of an indefinite and uncertain amount of iron, and hence required the plaintiff to explain how much it had converted, when by its pleadings it had claimed, and by its evidence shown that it had converted none. As well say that a defendant, who by his pleadings had denied the commission of, and by his evidence shown he had not committed, a charged larceny, and who on his theory had given in evidence full explanations of all transactions connected therewith clearly showing his innocence, nevertheless was also on the theory of his adversary required to show the amount and value of property purloined by him.

Now, as to the insufficiency of the evidence: As already shown, there is a total want of evidence that the plaintiff, as alleged in the counterclaim, unlawfully or wrongfully took or carried away a pound of the defendant's iron. No such claim, on the evidence, is made. The claim made is that Wright wrongfully took iron from the defendant and without authority delivered and sold it to the plaintiff, and that the amount thereof is as evidenced by the aggregate amount of the checks. But there is also no evidence to show that Wright wrongfully took a pound of iron or wrongfully sold any to the plaintiff. There is the evidence of Croft, Sr.'s, admission that he received iron from Wright; that he paid him for it; and that he presumed Wright

had paid it to the defendant. But there is no evidence that Wright, the defendant's foreman, who inspected the work and whose duty it was to see that it was done in accordance with the contract, and who, as shown, on at least several occasions with the knowledge and consent of the defendant, ordered goods and material, and who, jointly **4, 5** with the superintendent of distribution, looked after and took charge of the scrap iron strung along the streets, unlawfully or wrongfully took any iron or wrongfully sold or delivered any to the plaintiff. The defendant did not even show that Wright was unauthorized to sell scrap iron on behalf of the defendant. It did show that he had no authority to sell its scrap iron "on his own account." The evidence on this point is: The superintendent of distribution, after testifying that Wright received his orders from him, was asked and he answered: "Q. Did you ever authorize Wright to sell any scrap iron? A. On his own account? Q. Yes. A. No, sir." And in the defendant's counterclaim, verified by its general manager, the defendant alleged that Wright "was the acting agent of the defendant in making purchases" of supplies for the defendant from the plaintiff, and in effect transacted the business for the defendant with the plaintiff in the making of such purchases.

The only legitimate inference upon the record is that Wright had authority to sell and dispose of the scrap iron. At least there is ample evidence from which such an inference may be deduced. If he had no such authority, the defendant well could have shown it. Instead of showing the want of such authority, it adduced evidence which rather tended to show that he had authority. Hence, in view of the undisputed evidence, the admission of Croft that he had received iron from Wright and paid him for it does not support the claim that the plaintiff wrongfully or without authority received the defendant's iron and converted it. In the next place, the admission of Croft, Sr., was not a binding admission of the plaintiff. He was the secretary of the plaintiff corporation, and its bookkeeper, and collec-

42 Utah 35

tor. The rule is well settled that, to bind the principal with an admission of his agent, the declaration or statement of the agent must have been made within the scope of his employment and during the transaction of business by him for the principal and in relation to such business; that is, the declaration or statement of the agent must be contemporaneous with or in the course of the business · or transaction and in relation thereto conducted by the agent for the principal within the scope of the agency. The declarations or statements of the agent here were not made under any such circumstance. They were made long after the transactions with respect to which they were declared had wholly ended, long after the business had been conducted, and were not made in the course of nor in relation to any business which the agent was then transacting or conducting for the principal. Certainly an agent not in the course of transaction of any business for his principal, may not on the public mart or elsewhere make binding admissions of fact against his principal by a mere narration of facts relating to transactions wholly ended and long past. Property rights of the principal cannot be bartered away in any such manner as that. Croft, of course, could have been called as a witness and permitted to testify to any fact within his knowledge. But his admission, under the circumstances, was not evidence against his principal, the plaintiff. He was called as a witness, not by the defendant, but by the plaintiff, and gave testimony, not only in dispute of the admission but of facts wholly at war with it. We think the evidence insufficient to sustain the defendant's counterclaim. The judgment, therefore, cannot be sustained, for two reasons: The erroneous charge, and insufficiency of the evidence to support the counterclaim.

The further question is, What order should now be made, whether to remand the case for a new trial or to direct a judgment in favor of the plaintiff? In actions at law where judgments are reversed for errors such as here, the cause generally is remanded for a new trial. But here the plaintiff's claim is confessed. On its counterclaim the

defendant already has had three trials in the district
court. The whole of the evidence with respect to
two, and the substance of the other, is before us. On nei-
ther did the defendant produce or proffer sufficient compe-
tent evidence to support its claim. We think it evident
the jury rendered a verdict for the defendant on the last
trial solely because of the charge. That was the opinion
too of the trial court. Said the court in refusing a new
trial: "I think the verdict the first time was obtained very-
largely now, I think, because of the lack of a proper in-
struction. . . . I think that if the first jury had been
given the same instructions that they were given in
the last trial as to the burden of proof, the verdict
would have been different in the first case" (trial). The
court further observed that on the first trial the jury "were
instructed that the burden was on the defendant to prove,
not only that the plaintiff had obtained iron (that is, had
converted iron belonging to the defendant), but the amount
of it also, and that was the extent of the instruction," and,
after stating that upon the evidence the jury could not defi-
nitely fix that amount, observed, "But when I instructed
them in the last case that, if they were satisfied from the
evidence that the plaintiff had converted some amount, then
the amount it may have converted was peculiarly within the
knowledge of the plaintiff and it should not profit by its
wrongdoing, but must disclose the amount;" and, because
the plaintiff had not done that and "concealed that amount,"
the jury reached the conclusion as evidenced by their ver-
dict. This we think fairly reflects the intended meaning
of the charge and the application the jury made of it. As
already observed, we think the charge wrong and highly
prejudicial. And since the defendant has had three trials
in the district court on the issues presented by its counter-
claim, and since in neither it adduced or proffered sufficient
competent evidence to support its claim, and since it pre-
vailed only because of the erroneous charge, we think this
litigation ought to end. We cannot see any good to be sub-
served, or any benefit to the defendant, by remanding the

case for another trial. Whatever may be the real merits of this controversy, we think we may assume that when the defendant by its proffered evidence on three trials was unable to support its claim, to do which it, and not the plaintiff, had the burden, it cannot do so on a fourth trial.

The order, therefore, is that the judgment of the court below be reversed and vacated and the case remanded to the district court, with directions to dismiss the counterclaim and to enter a judgment in favor of the plaintiff for the amount alleged in its complaint, together with interest thereon. The plaintiff is awarded all costs on the appeal and all taxable costs in the court below, except those incurred on the second trial.

FRICK, C. J., and McCARTY, J., concur.