[Civil No. 1486.  Filed June 2, 1916.]

[157 Pac. 986.]

# O. K. FRANKLIN, Appellant, v. HAVALENA MINING COMPANY, a Corporation, J. WELLS SMITH, W. A. O'CONNOR, I. BURGOON, R. R. EARHART and E. D. MILLER, Appellees.

1. EVIDENCE—ADMISSIONS BY AGENT—EFFECT OF.—Declarations of an agent are admissible against the principal only when the agent is acting within the scope of his authority, and this rule applies to corporate agents.

2. EVIDENCE—AGENTS—POWERS OF SECRETARY.—Declarations by the secretary of a corporation that a meeting of the board of directors had been ordered to pass upon a lease which purported to have been executed by the corporation are not binding on the corporation when made by the secretary in a casual conversation with one who intended to acquire an interest in the lease; such declarations not being within the scope of the power of the secretary who has not the power of a general or managing agent, and this being particularly true where the prospective purchaser did not request permission to examine the corporation's books.

3. CORPORATIONS—LEASE—VALIDITY—"EQUITABLE ESTOPPEL."—Defendant, before purchasing an interest in a mining lease purporting to have been executed by the corporation, in a casual conversation asked the secretary of the corporation whether a meeting of the directors to approve the lease had been ordered. The secretary replied that it had, and that the corporate minutes so recited. Defendant did not inform the secretary that he intended to acquire an interest in the lease, nor did he request permission to examine the books of the corporation. The minutes did so falsely declare. *Held* that, though estoppel *in pais* or equitable estoppel, not being an estoppel preventing a party from telling the truth, but one arising out of conduct or misrepresentations, is not in disfavor, yet the corporation was not estopped by the secretary's conduct from questioning the validity of the lease; for defendant was not dealing with the corporation, nor was his interest declared, and the declarations of the secretary did not show the lease to be valid.

4. CORPORATIONS—VOID LEASE—RIGHTS OF TENANT—MONEYS SPENT.— Where a mining lease purporting to have been executed by a corporation was void, one entering under such lease, while chargeable with the value of ore extracted, is not entitled to reimbursement

for money spent on the premises, but is to reimbursement for rents paid.

[As to admissions and declarations of agents in actions against principals, see note in 53 **Am. Dec.** 773.]

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. R. C. Stanford, Judge. Reversed and remanded.

Mr. Selim M. Franklin, for Appellant.

Mr. Frank J. Duffy and Mr. Sylvester S. Downer, for Appellees.

FRANKLIN, J.—This is a suit by a stockholder of a corporation brought in his own behalf and that of others similarly situated to obtain equitable relief against wrongful dealing with the corporate property. O. K. Franklin was plaintiff in the court below, and the Havalena Mining Company, a corporation, J. Wells Smith, W. A. O'Connor, I. Burgoon, R. R. Earhart and E. D. Miller were the defendants. The case was formerly here on appeal from a ruling of the lower court sustaining a demurrer to the complaint, which ruling was reversed, and the cause remanded. Since the reinstatement of the case in the superior court an amended complaint was filed, the amendment consisting in an allegation of the employment of an attorney to conduct the litigation and a prayer for the payment of attorney fees and the expenses of the plaintiff. There are two appeals before us; the plaintiff and the defendants, respectively, appealing from portions of the judgment. The record presented for review embraces the amended complaint, the answers of the defendants, the court's findings of fact and conclusions of law, judgment, and minute entries. A statement of the case will be found in the opinion of this court reported in 16 Ariz. 200, 141 Pac. 727. Iteration will therefore be avoided. The findings of fact made by the trial court follow the allegations of the complaint, so that the law of the case has been largely determined by the opinion given on the former appeal. From its findings of fact the court concluded as a matter of law:

That the lease and bond was "utterly null and void, except as to the one-fourth interest therein assigned by T.

Vastine to the defendant J. Wells Smith on September 27, 1912; that as to the said one-fourth interest therein the action of the secretary, I. Burgoon, in stating to said J. Wells Smith that said lease and bond had been authorized at a meeting of the directors of said corporation, and had been entered upon the minute-books of said company, estops the said defendant corporation from denying the validity of said lease and bond, as against the said one-fourth interest therein purchased by the said J. Wells Smith; the said statements of said Burgoon having been made to said J. Wells Smith prior to his purchasing the said one-fourth interest from said Vastine."

This conclusion of law was based upon the following findings of fact, to wit:

"That prior to purchasing the said one-fourth interest from said T. Vastine the said J. Wells Smith saw the said I. Burgoon, secretary of the Havalena Mining Company, in Nogales, on or about the twenty-sixth day of September, 1912, and then asked the said Burgoon if there had been a meeting of the directors ordered to pass on said lease and bond; and the said Burgoon then informed him that there had; that said Smith then asked said Burgoon if it was entered in the minute-book; and said Burgoon answered 'Yes,' and also stated that a copy of the said lease and bond was attached to the same page, or the next page, of the record; that said Burgoon further stated that the record-book itself was at his house, but that he did not have time then to get it; and that the said Smith then said to Burgoon, 'If you tell me there is a record of such a meeting, and that there is a copy of the lease and bond attached, that is satisfactory.'

"Said Smith did not see the purported minute entry of said alleged directors' meeting, but relied upon the said statements of said Burgoon, and thereafter purchased the said one-quarter interest from said Vastine and paid him therefor as aforesaid.

"The said Smith was not a stockholder of the said Havalena Mining Company, nor did he become such a stockholder until some time thereafter, to wit, September 26, 1912, nor did the said Smith inform said Burgoon that he, the said Smith, contemplated purchasing the interest of said Vastine or of any other person in said lease and bond, or otherwise

inform said Burgoon of the reason why he, said Smith, asked for the information above set forth.

"That the said Smith relied upon the assurances of said Burgoon as just mentioned and believed the same, and believed- that said bond and lease was the lawful act of said company, and that had it not been for said reliance, said Smith would not have purchased said interest from said Vastine."

The language used in the court's conclusion of law that Burgoon said to J. Wells Smith "that said lease and bond had been authorized at a meeting of the directors" is not quite justified by the findings of fact. Burgoon was asked if there had been a meeting of the directors ordered to pass upon the lease and bond, and he answered that there had. Burgoon was then asked if it was entered in the minute-book, and he answered "Yes," and stated that a copy of the lease and bond was attached to a page of the record. The facts as found will be considered to determine whether the court was right in predicating an estoppel against the corporation by reason of the representations of fact made by its secretary, Burgoon.

We shall therefore determine first: Was Burgoon when he answered the question propounded to him by Smith acting within the scope of his authority and during the transaction of any business by him for the corporation? Was the corporation concluded by Burgoon's answer upon the ground of an equitable estoppel from averring the fact is otherwise than the answer of its secretary represented it to be?

Corporations are artificial persons, and must necessarily act and speak by and through their authorized agents. Natural persons may act for themselves, or through agents appointed by them, but, when such persons transact business through the medium of agents, they are not bound by everything their agents may say or do. The declarations of an agent are admissible only because treated as the declarations of the principal, and the law is well settled that the principal is bound by them only while the agent is acting within the scope of the duties for which he was employed and at a time he is engaged in the transaction of the business of his principal to which they refer; otherwise what he says or does binds himself only, or no one. The reason for the rule must

be apparent; for otherwise it would be extremely hazardous for anyone to employ an agent if the mere fact of such employment would constitute the agent *alter ego.* While corporations can only speak through agents, nevertheless the corporation is bound by the declaration of an agent precisely as a natural person would be bound, that is, by the declaration of its agent made while acting within the scope of the agent's authority to act and as a part of some authorized transaction with third persons.

Where an agent is negotiating a transaction or making a contract on behalf of his principal, his representations, declarations and admissions in connection therewith respecting the subject matter will be binding on the principal where they are made at the time and as a part of the transaction. 2 C. J., Agency, § 541; 2 Jones on Commentaries on Evidence, § 356; Mechem on Agency, § 1783; 3 Cook on Corporations, 6th ed., § 726; 3 Clark & Marshall on Private Corporations, § 725.

"Declarations or admissions by an agent of his own authority, and not accompanying the making of a contract, or the doing of an act in behalf of his principal nor made at the time he is engaged in the transaction to which they refer, are not binding upon his principal . . . and are not admissible in evidence." *Franklin Bank* v. *Pennsylvania etc. Nav. Co.*, 11 Gill & J. (Md.) 28, 34, 33 Am. Dec. 687.

"While corporations can act only through agents, and their declarations are considered the same as in cases of admissions of private persons, the same rules apply to both, and it is indispensable that the statement, to be binding, must be within the scope of the agent's authority and in the execution of his agency." *Anderson* v. *Great Northern Ry. Co.*, 126 Minn. 352, 148 N. W. 462.

Mr. Justice DICKINSON, speaking for the supreme court of Minnesota in a case where, before stock in a corporation was purchased from a third person, inquiry was made by the purchaser of some of the officers of the corporation who stated that all stock had been paid for, which statement induced the purchase, said:

"The mere fact that one is a director, president, secretary or other officer of a corporation does not make all his acts or

declarations, even though relating to the affairs of the corporation, binding upon the latter. Such persons are mere agents, and their declarations are binding upon the corporation only when made in the course of the performance of their authorized duties as agents, so that the declarations constitute a part of their conduct as agents—a part of the *res gestae*. [Citing authorities.] There was no proof of authority on the part of any of the persons whose declarations are relied on, beyond the fact that they were officers or directors. Nor are the circumstances disclosed under which the representations were made. So far as appears, the statements were in no way connected or associated with the performance of any duty devolving upon, or any way delegated to, the agents who made them. While the representations relate to the subject of the corporate stock, yet the theory of the defendant and the evidence in support of it are opposed to the idea that the representations constituted a part of a transaction of sale of the stock by the corporation; for the contention of the defendant is that he did not purchase from the corporation at all, but from Foote.'' *Browning* v. *Hinkle,* 48 Minn. 544, 31 Am. St. Rep. 691, 51 N. W. 605.

Here it appears that there was a fictitious entry of a pretended action of the corporation concerning a certain bond and lease, and a false statement concerning a call for a meeting of the directors of the corporation ordered to pass upon the same attributed to its secretary, but not connected with any official act of the secretary in communicating the actions of the corporation. The corporation gave its secretary no express authority to make a false entry in the minute-book, nor to make any statement with reference thereto. The power of the secretary, therefore, to affect the principal by his statements, if it exists, must be implied from his authority to act as secretary of the corporation. Even though the making of the statements or declarations may not have been expressly authorized, they may be authorized by implication if they are the natural and ordinary incidents of the position which the agent occupies, such as general manager, general agent, etc.

While it may be difficult to state precisely the implied power which the secretary may exercise by virtue of his office, such powers are quite limited, and it seems to be very clear that

the law does not ascribe to the secretary of a private corporation any of the powers of a general or managing agent. *City of Chicago* v. *Stein,* 252 Ill. 409, Ann. Cas. 1912D, 294, and note, 96 N. E. 886; Thompson on Corporations, 2d ed., § 1513.

Unless the rule be properly guarded, and the facts of each particular case placed within the required limitations as to when one should be bound by the acts and statements of another, the mere fact that one is an officer or agent of a corporation would empower him indirectly to turn over the entire corporate property to third persons. The officers of corporations are agents, and the rule admitting their statements in evidence is founded upon the doctrine of agency, and their declarations, to be binding upon the corporation, must be made in the course of or connected with the performance of the authorized duties of such officers. The statements of Burgoon were not expressly authorized by the corporation, nor were they authorized by implication as the natural and ordinary incidents of the position which he occupied, nor were they connected in any manner with the discharge of any duties by him as an officer or agent of the company. It would be a dangerous innovation, indeed, to ingraft upon the law of agency the doctrine that the principal is bound by the mere idle gossip or desultory or careless talk of the agent. Property rights of the principal cannot be bartered away in any such manner. 16 Cyc. 1006; Mechem on Agency, 2d ed., § 1783; *Utah Foundry etc. Co.* v. *Utah Gas etc. Co.,* 42 Utah, 533, 131 Pac. 1173; *Benner* v. *Feige,* 51 Mich. 568, 569, 17 N. W. 60; *Zentner* v. *Oshkosh Gas etc. Co.,* 126 Wis. 196, 105 N. W. 911.

An answer to the second question *supra* is equally decisive against the contentions of the defendants. We have now to deal with the doctrine of equitable estoppel or estoppel by conduct, using the word "conduct" in its modern sense as including a person's spoken or written words, his positive acts, and his silence or negative omission to do anything; the facts of this case limiting the application to spoken words.

Lord Coke divides estoppel into three kinds, viz.: By matter of record, as by letters patent, fine, common recovery, and pleading; by matter in writing, as by deeds indented; and by matter *in pais,* by acts of notoriety, as by livery, by

entry, by acceptance of rent, and by partition. He gave a somewhat rugged definition of the term compatible, however, with the rugged conditions in his time, saying that "estoppel" or "conclusion" was given because "a man's own act or acceptance stoppeth or closeth up his mouth to allege or plead the truth." Co. Litt. 352 A. The infelicity of this definition, which is an inaccurate one according to the modern conception of the subject, together with the fact that such were technical legal estoppels and were sometimes used to shut out the truth against reason and sound policy, lent an odium, and consequently they were in disfavor until a comparatively recent period.

"In modern times," says Mr. Bigelow, "the doctrine has lost all ground of odium and become one of the most important, useful and just factors of the law. It is safe to say that at the present day it is seldom employed in any questionable way to exclude the truth; its whole force being directed to preclude parties, and those in privity with them, from unsettling what has been fittingly determined. A just principle, it can be and is daily administered to the well-being of society; unfortunate, indeed, would it be if this were not true. Estoppel would hardly have needed a justification but for the authority of a definition by Sir Edward Coke." Bigelow on Estoppel, 6th ed., p. 6.

Says another learned author:

"A man is not prevented, by estoppel, from telling the truth. He is only barred from the assertion of a right or title by some previous action or conduct on his part which would render the present assertion of his right unjust. . . . In other words, where an act is done or a statement made by a party under such circumstances that to impair its efficacy or controvert its truth would be (to quote the language of CHITTY, J., in the case of *Colonial Bank* v. *Hepworth,* 36 Ch. D. 53 and 54) 'contrary to justice and good faith,' the result is that the party is debarred from asserting any right or title in opposition to any right which has been acquired in reliance upon such act or statement; and this result is called an estoppel. Viewed in this light, estoppels are not odious suppressions of the truth, as they were considered to be in the old law; but are part of the machinery by which

equitable conclusions are reached.'' Bispham's Principles of Equity, 8th ed., § 280.

Since Coke's time there has grown up a large class of estoppels by matters *in' pais*. Some may be considered legal estoppels, but others in an infinite variety have come before the courts arising from conduct as a creature of equity. We have to do now with this latter class of purely equitable estoppels, which though recognized and acted upon in courts of law as well as in courts of equity, nevertheless owe their origin and development to the ideas of justice obtaining in the courts of chancery. This distinction between estoppel from conduct as a creature of equity and estoppel *in pais* at law is pointed out with admirable precision and learning in an opinion by Mr. Chief Justice PERLEY in the case of *Horn* v. *Cole*, 51 N. H. 287, 12 Am. Rep. 111. Mr. Pomeroy, citing this case as authority for the text, and with a high encomium upon it, says:

''Although the facts from which equitable estoppels arise are all matters *in pais* as distinguished from records and deeds, yet the whole doctrine is an expansion of and addition to the original legal estoppels *in pais,* and embraces rules unknown to the law when Lord Coke wrote. Equitable estoppel in the modern sense arises from the conduct of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of law, unless prevented by the estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefits of the estoppel.'' Pomeroy on Equity Jurisprudence, § 802.

Equitable estoppel therefore being a particular doctrine grounded upon justice and good conscience, its application may not depend upon any strict or precise definition that will cover the infinite variety of cases that call for an adjudication, but each case rather must be determined according as the particular facts and circumstances fall within the principle on which the doctrine is founded. Approaching

a solution of the question with this conception of duty, do the facts and circumstances of this case conclude the Havalena Mining Company in equity and justice from asserting its rights because of the conduct of its secretary, Burgoon, in the situation and under the circumstances disclosed by the findings of fact made by the trial court? There are some essential elements in equitable estoppel. We shall dwell upon one of these.

Mr. Bispham says:

"The party against whom an estoppel is alleged must intend that his conduct should be acted upon, although he may not have intended to deceive." Bispham's Principles of Equity, 8th ed., § 290.

"It is an essential element of an equitable estoppel that the acts, representations, or silence relied on to create the estoppel must have been willfully intended to lead the party setting up the estoppel to act upon them. The word 'willfully', as used in this connection, is not, however, to be taken in the limited sense of the term 'maliciously' or 'fraudulently'; nor does it necessarily imply an active desire to produce a particular impression or to induce a particular line of conduct; it is sufficient if the acts, representations or silence relied on are of such character as to induce a reasonable and prudent man to believe that they were meant to be acted on." 16 Cyc., p. 726.

Mr. Bigelow says the estoppel arises "from act or conduct which has induced a change of position in accordance with the real or apparent intention of the party against whom the estoppel is alleged." Bigelow on Estoppel, 6th ed., p. 489.

Mr. Pomeroy states the general rule thus:

"That if a person interested in an estate knowingly misleads another into dealing with the estate as if he were not interested, he will be postponed to the party misled and compelled to make his representation specifically good. . . . While the owner of land may by his acts in pais preclude himself from asserting his legal title (quoting from *Trenton Banking Co.* v. *Duncan,* 86 N. Y. 221, 230); 'it is obvious that the doctrine should be carefully and sparingly applied, and only on the disclosure of clear and satisfactory grounds of justice and equity.'" Pomeroy's Equity Jurisprudence, (3d ed.), § 807.

The supreme court of the United States has held that for the application of that doctrine there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury. *Brant* v. *Virginia Coal etc. Co.,* 93 U. S. 326, 23 L. Ed. 927. See, also, *Henshaw* v. *Bissell,* 18 Wall. (85 U. S.) 255, 21 L. Ed. 835; *Hobbs* v. *McLean,* 117 U. S. 567, 29 L. Ed. 940, 6 Sup. Ct. Rep. 870.

From a study of the cases it is learned that the doctrine of equitable estoppel had its origin from those situations where an actual intention to mislead is entertained by the person making the representation. It was first clearly enunciated in *Pickard* v. *Sears,* 6 Ad. & E. 469. Said DENMAN, C. J.:

"Where one by his words or conduct willfully causes another to believe the existence of a certain state of things and induces him to act," he is estopped.

The doctrine, however, was not destined to be restricted to the bounds of intentional or willful misrepresentation. In *Freeman* v. *Cooke,* 2 Ex. 663, PARKE, B., observed upon this point:

"If, whatever a man's real meaning may be, he so conducts himself that a reasonable man would take the representation to be true and believe that it was meant that he should act upon it, and did act upon it as true, the party making the representation would be equally precluded from contesting its truth; and conduct, by negligence or omission, when there is a duty cast upon a person by usage of trade or otherwise, to disclose the truth, may often have the same effect."

While the decisions of the courts are in apparent conflict whether the rule in its application should be restricted to the terms in which it was enunciated in *Pickard* v. *Sears,* or as it has been extended in *Freeman* v. *Cooke,* the doctrine having its foundation in justice and good conscience, it would appear to be the better position to take that, when one either by words or conduct made to another a representation of fact with the intention that it should be acted upon, or has so conducted himself that another would, as a reasonable man, understand that a certain representation of fact was intended

to be acted on, and that other has acted on that representation, and thereby altered his position to his prejudice, an estoppel arises against the party who made the representation, and he is not allowed to aver that the fact is otherwise than he represented. If the doctrine be carried to that extent, then this case does not fall within that principle; for the circumstances here are such as to preclude any fair deduction being made that the representation was made either with the intention that defendant Smith should act upon it, or that it was made under such circumstances that a reasonable man might naturally infer that it was intended that he should act upon it. Here both the questions propounded by the said Smith and the answers made by the said Burgoon were vague and inconclusive in their nature. The substance of the finding is that Smith met Burgoon somewhere in Nogales before he purchased the alleged interest of Vastine in the bond and lease. He was not dealing with the corporation for the sale and purchase of its property, but with a third party unknown to Burgoon. He was not asking for a certified copy of the minute entries on the books of the corporation or an official communication relating thereto from the secretary. He asked Burgoon if there had been a meeting of the directors ordered to pass upon the lease and bond, and Burgoon informed him that there had. What action did the corporation take? Did it authorize or refuse the lease and bond? The purport of the question did not comprehend, nor the answer of Burgoon pretend to say. "If you tell me there is a record of such a meeting" said Smith, "and that there is a copy of the lease and bond attached, that is satisfactory." Smith was not concerned apparently with the truth of the matter. He was not anxious to know that the bond and lease had been duly authorized; he was content to get a statement that a meeting had been called for such a purpose. "If you tell me there is a record of such a meeting, and that there is a copy of the lease and bond attached, that is satisfactory." Was Smith striving to get at the truth of the matter, or was he merely laying the foundation for the assertion of an estoppel against the corporation, to assert its right to the property? The answer to this only the Searcher of Hearts may give. But courts of justice may give the answer that the inquiry and the re-

sponse are too vague and inconclusive under the circumstances to ground an estoppel upon.

"The representation, further," says Mr. Bigelow, "to justify a prudent man in acting upon it, must be plain, not doubtful, or matter of questionable inference. Certainty is essential to all estoppels. The courts will not readily suffer a man to be deprived of his property where he had no intention to part with it." Bigelow on Estoppel, 6th ed., p. 641.

The utmost good faith which may be exacted from him against whom the estoppel is urged is not less obligatory upon him who urges the conclusion, and the application of the rule should be stayed except in cases where is discerned reciprocal concessions in this behalf. It seems to us, in the circumstances pictured here, to have been the plain duty of Smith to indicate to Burgoon that he intended to become a purchaser in the lease and bond, and that his question was asked with the intention of acting upon it; otherwise Burgoon was under no obligation to go into that matter with a mere stranger to the subject, who, so far as he had reason to know, was making the inquiry out of mere idle curiosity. It is not to be supposed that a man may be accosted upon the street and interrogated by an impertinent stranger, who has no interest in the subject, about the title to a piece of property, and then upon the doctrine of equitable estoppel conclude the one interrogated either by his silence or by what he says.

Again says Mr. Bigelow:

"Where an inquiry has been made which has resulted in the representation in question, it is necessary that the purport of the inquiry should be made clear; if that be not the case, there cannot be said to be any intention, whether actual or presumptive, that the representation should be acted upon. . . . No one, however, could be estopped, it was declared in *Stephens* v. *Baird,* 9 Cow. (N. Y.) 274, by a deceptive answer to a question which he might rightly deem impertinent." Bigelow on Estoppel, 6th ed., p. 693.

It cannot be argued with any just conception of the doctrine of equitable estoppel that, if a person makes a misstatement, without any intention that another party should act upon it, and when he could not expect that another party would act upon it, that in such a case, he is bound.

Many years ago there was a club in London which became known as "the Literary Club." The members met in the Turk's Head Tavern supping weekly, and engaging until a pretty late hour in the brilliant conversation that could be expected from the celebrated men so associated. This club was founded by Dr. Samuel Johnson, the eminent philosopher, whose discernment was as acute in judging of the character as in the profession of letters. Among its members were Sir Joshua Reynolds, the painter; Edmund Burke, the orator and writer; the poet, Oliver Goldsmith; the actor David Garrick; James Boswell, the best of biographers; Charles James Fox, unsurpassed as a debater by any member who ever sat in the British House of Commons; Edward Gibbon, the historian; Dr. Adam Smith, the economist; and Richard Brinsley Sheridan, acclaimed the foremost of all British orators. In this gathering of men Dr. Johnson was pre-eminent, usually leading the conversation, and in a sense the autocrat. It is recorded of Dr. Johnson that he remarked once at the club, with a perhaps too insular British pride, that there was nothing of which he would not undertake to persuade a Frenchman in a foreign country.

"I'll carry a Frenchman to St. Paul's Churchyard, and I'll tell him, 'By our laws you may walk halfway round the church, but if you walk round the whole, you will be punished capitally,' and he will believe it at once. Now, no Englishman would readily swallow such a thing; he would go and inquire of somebody else."

Thus *apropos* of the cardinal idea that must necessarily underlie and support the successful claim to a right founded upon an equitable estoppel was the talk of the rugged Johnson; and thus, according to the idea of justice obtaining in the courts of chancery, sanctioned by the long experience of men, one is not justified in believing and so acting unless the circumstances and the matter be such that a reasonably prudent man would, in a like situation, believe and be vindicated by his conduct in obedience to that belief. This is the yardstick by which the conduct of men in their business relations is measured in court when appropriate to the maintenance of a right originating in an equitable estoppel; and this is the yardstick that must discipline their credulity with a reasonable restraint, lest, unfettered, it should in the given case

unjustly serve to impair or dissipate the rights of others. By this measure, therefore, the credulity of Mr. Smith in the circumstances as here depicted cannot be allowed to take away the right of the Havalena Mining Company to its property.

It is urged, however, that if Mr. Smith had examined the records of the Havalena Mining Company, he would have gained no more information than Burgoon had given him. But the estoppel is not grounded upon the records of the corporation, but upon a casual conversation between Smith and Burgoon somewhere in Nogales. Smith would perhaps not have been allowed to inspect the books unless his interest in the matter was indicated, and Burgoon, if he had known the purport of the inquiry, would perhaps have hesitated to certify a false entry or officially communicate such to be the action of the corporation with the intention to defraud Smith, or have permitted Smith, had he been given opportunity to inspect the record, to go away without throwing further light on the subject; and again the character of the pretended minute entry may be such that no reasonably prudent man under the circumstances would have been justified in acting upon the faith of it. However, it is obvious such matters may not be determined under the facts of this case. We are persuaded that, according to equity and good conscience, the corporation, under such a state of facts, should not be precluded from asserting its right to the property on the ground of equitable estoppel. If the defendant Smith has been wronged by the action of certain officers of the corporation in pretending to act for it in making the lease and bond, he has a remedy. Under the facts of this case there was an implied promise upon the part of the officers of the corporation that they possessed the authority to make the lease and bond, which authority they assumed to have. If in making the contract they had no authority to bind the corporation they assumed to represent, they should be answerable for the consequences, and that they were without such authority is clear from the findings of fact made by the trial court.

Some exception is made to the appointment of a receiver, but the exception is not pressed very strongly. The evidence upon which the court acted is not in the record, but from

the allegations in the pleadings and the findings of fact we are not prepared to say that the court was not justified in making the appointment in order to conserve the property of the corporation, and protect the rights of the minority stockholders.

Equitably the defendant Smith is not entitled to be reimbursed for any moneys expended by him while a trespasser upon the property, except as hereinafter indicated, and he should account for and return the proceeds of the sale of any ores or other property of the corporation received by him and diverted to his own use. The defendant Smith is, however, equitably entitled to have returned to him any payments called for in the lease and bond which he has made on account of the purchase price of the property, and also such amounts, if any necessary, which he has expended to preserve the title to the property while in possession, but no other sums whatsoever. The record presented does not enable this court to definitely fix these amounts, and we shall therefore reverse the judgment and remand the case, with directions to proceed to judgment in accordance with the views expressed in this opinion.

It is so ordered.

ROSS, C. J., concurs.

CUNNINGHAM, J. (Concurring).—This cause was tried before the court, a jury having been waived. Paragraph 528 of the Civil Code of 1913 provides that:

" . . . The court may in any case, and shall, at the request of either party, make written findings of fact, stating the facts found by the court and the conclusions of law separately."

The expression "make written findings of fact," in my opinion, requires the trial judge to make findings of the ultimate facts which, when filed, is in all material respects a special verdict.

Paragraph 538 of the Civil Code of 1913 prescribes as follows:

"The special verdict must find the facts as established by the evidence, and not the evidence by which they are established, and the findings must be such as that nothing remains

for the court but to draw from such facts the conclusions of law.''

When the trial judge makes and files written findings of fact, the findings so made and filed must be such as that nothing remains for the court but to draw from such facts the conclusions of law, and file such conclusions of law separately. The findings of fact involved in this record, in my opinion, are not the finding by the court of the ultimate facts, but the findings of the evidence; the trial court recites the evidence given by the witnesses. From this evidence recited the ultimate fact to be drawn is that the corporation gave no information and made no representations to Smith upon which he could rely and act to his disadvantage. Because Burgoon was secretary of the corporation is no legal reason to assert that he was authorized to give information or make representations which would bind the corporation and close its mouth. Consequently, from the evidence recited in the purported findings, the fact appears that the information given Smith and the representations made to Smith were given and made by one without authority from the corporation, and consequently such information and representations were not given nor made by the corporation.

Had the trial court found this ultimate fact from the evidence in the case, and this is the only ultimate fact established by the evidence, but one conclusion of law could follow, and that conclusion is that the corporation is not estopped to assert its rights to the property involved as against Smith.

For these reasons, I concur in the judgment of the majority of the court.