2001 UT 86

**Steve FEATHERSTONE, Plaintiff,**

**v.**

**Grant SCHAERRER, Paul Burt, Thermo Mechanical Sales, Inc., dba TMS, Inc., and Roger Johnson, Defendants, Appellees, and Cross–Appellants.**

**Blake S. Atkin, Appellant and Cross–Appellee.**

No. 990310.

Supreme Court of Utah.

Oct. 16, 2001.

Rehearing Denied Nov. 14, 2001.

Keith A. Kelly, Melissa H. Bailey, John W. Mackay, Salt Lake City, for defendants.

Blake S. Atkin, Scott M. Lilja, Jonathan L. Hawkins, Salt Lake City, for Atkin.

RUSSON, Associate Chief Justice:

¶ 1 Attorney Blake S. Atkin, counsel for plaintiff Steve Featherstone in the dispute underlying this appeal, challenges two trial court orders finding that he violated Utah Rule of Professional Conduct 4.2 and Utah Rule of Civil Procedure 34, and awarding sanctions for his actions. We affirm in part and reverse and remand in part.

## BACKGROUND

¶ 2 On April 16, 1993, plaintiff Steve Featherstone ("Featherstone") filed suit against two of his business partners, Paul Burt ("Burt") and Grant Schaerrer ("Schaerrer"), and the corporation they had together founded, Thermo Mechanical Sales, Inc. ("TMS"). The central issue in the dispute was the extent of Featherstone's ownership in the corporation, specifically "[d]efendants' conduct in refusing to issue stock to Plaintiff."

¶ 3 To proceed with his action, Featherstone retained attorney Blake S. Atkin ("Atkin"). On April 29, 1993, defendants served their first request for production of documents pursuant to Utah Rules of Civil Procedure 33 and 34. In these interrogatories, defendants requested production of "all documents ... concerning [Featherstone's] asserted ownership or interest in TMS, including documents concerning any communications about [the] alleged ownership or interest," along with "all documents ... related to ... any communications with the Defendants or any other person concerning [Featherstone's] interest in or ownership of TMS." The production request further provided that "[i]f any documents are withheld under a claim of privilege," plaintiff was to notify defendants of each document's identification, date, general content, and grounds for nondisclosure. Following defendants' request, both parties reached a stipulation agreement providing that "Plaintiff ... will produce ... on or before May 13, 1993, ... the documents requested by Defendants in their First Request for Production of Documents ..., with the exception of Plaintiff's tax returns...."

¶ 4 On the same day the stipulation agreement was reached, May 10, 1993, Roger Johnson ("Johnson"), a founding director of TMS who was serving as secretary and treasurer of the corporation at the time, telephoned Atkin and agreed to allow Atkin to record their conversation. During their conversation, Atkin questioned Johnson about a number of issues related to the ownership of TMS, including "why the shares in the corporation were never issued," the "dispute ... between [Featherstone], [Burt], and [Schaerrer]," their "original negotiations" over the founding of the business, the division of ownership among the corporate founders, and Johnson's own interest in the company. At the end of their discussion, Atkin informed Johnson that he had been "name[d] ... as a defendant in the lawsuit now."

¶ 5 Shortly after Atkin's conversation with Johnson, progress in the suit languished. Eventually, in 1996, activity began anew, and both parties again pursued discovery. On November 19, 1996, defendants served a second set of document production requests. These interrogatories requested production of "[a]ll documents ... on which your damage claims in this action are based, including materials bearing on the nature and extent of injuries suffered." In addition, defendants propounded "[e]ach document ... that [plaintiff] reasonably believe[s] [plaintiff] will offer at the trial of this matter, or which

[plaintiff] may offer if the need arises." Subsequently, on December 18, 1996, plaintiff responded, among other things, that he objected to defendants' interrogatories "to the extent [they] call for information or documents protected under the attorney-client or the work product doctrine."

¶ 6 On January 6, 1997, Atkin deposed Johnson. During the deposition, Atkin began using a transcript of his May 10, 1993, conversation with Johnson for cross-examination purposes. Upon revelation of this earlier conversation, counsel for defendants questioned Atkin about the conversation's substance, whether it had been conducted before or after the suit had been filed, and whether Johnson was a named defendant in the suit at the time. Following this exchange, counsel for defendants objected to use of the transcript, adjourned the deposition, and attempted to schedule a date for the deposition's continuation subsequent to the transcript's production. Atkin replied that defendants' counsel was "not entitled" to the transcript, and that he would "file a motion to compel" Johnson's deposition and "seek sanctions" for defendants' "outrageous . . . ploy to delay the discovery in th[e] case."

¶ 7 The next day, on January 7, 1997, Atkin moved to compel the deposition of Johnson and to obtain "attorney fees in pursuing this [m]otion and in preparing for another deposition." In support of his motion, Atkin contended that "a parties' [sic] prior statement need not be disclosed until he has been deposed."

¶ 8 On January 10, 1997, defendants moved to suspend Johnson's deposition until the parties' discovery dispute was resolved by the court. Specifically, defendants sought to have the trial court determine that Atkin had violated Utah Rule of Professional Conduct 4.2 by "conduct[ing] an ex-parte interview of Roger Johnson by telephone . . . after th[e] litigation commenced," and to disallow use of any such "improperly obtained ex-parte conversation" during the course of the litigation. In addition, defendants requested that the trial court compel production of all recorded conversations "as previously requested by defendants," and that the court award "costs and legal fees incurred in [defendants'] efforts to compel discovery from plaintiff."

¶ 9 On January 21, 1997, Atkin responded to defendants' motion to compel production of the transcript, arguing among other things that he was not required to furnish defendants with the transcript because it was protected by the attorney work product privilege. Atkin stated, "The transcript of . . . counsel's conversation with Mr. Johnson was prepared in anticipation of litigation and to assist in trial preparation. Pursuant to Rule 26(b)(3) of the Utah Rules of Civil Procedure, therefore, such transcript is protected from disclosure to third-parties under the work-product doctrine."

¶ 10 After considering the parties' respective motions, the trial court ruled on the matter in a written order dated July 9, 1997. The court found that when Atkin recorded his conversation with Johnson on May 10, 1993, Johnson "was a director, officer[,] and employee" of TMS, Atkin had already named TMS as a defendant in the suit, and Johnson was named as a defendant on that "very day." The court therefore determined that Atkin had violated Utah Rule of Professional Conduct 4.2 by engaging in ex parte communications with a person represented by counsel, and accordingly ordered that "no ex-parte conversation by Plaintiff's counsel with any of the Defendants, including the May 10, 1993[,] conversation between Johnson and [Atkin], be referred to or used in this litigation." The court further ruled that, despite his argument asserting the transcript was protected from production by the work product privilege, Atkin had, in violation of Utah Rule of Civil Procedure 34(b), inappropriately withheld the transcript of the conversation from defendants after they had requested such documents in their interrogatories and again during Johnson's deposition. Consequently, the court ordered Atkin to produce the document pursuant to rule 37(a) of the Utah Rules of Civil Procedure, and awarded defendants their "costs and legal fees incurred" in pursuing their motion to compel production and in defending against Atkin's motion to compel Johnson's deposition pursuant to Utah Rule of Civil Procedure 37(a)(4). According to the order, these costs and fees

were to "be paid directly by [Atkin], and not by Plaintiff."

¶ 11 Subsequently, on February 19, 1998, Atkin moved the trial court to reconsider and set aside its July 9, 1997, order. Specifically, the motion argued that Atkin had not violated Utah Rule of Professional Conduct 4.2 because "the evidence at trial" failed to show Johnson was a "high-level or managerial employee" of TMS. In response, defendants asserted that the evidence at trial showed Johnson to be "an incorporator and officer of TMS," and also requested that "additional sanctions" be awarded for additional ethical violations Atkin had allegedly committed. Defendants further pointed out that Atkin had failed in his February 19, 1998, motion to challenge the portion of the court's July 9, 1997, order awarding attorney fees against Atkin for his failure to produce the transcript of his conversation with Johnson in compliance with Utah Rule of Civil Procedure 37(a)(4). Atkin then replied by reasserting his contention that Johnson neither possessed "managerial responsibility" at TMS nor "ha[d] authority to bind" the corporation. In addition, Atkin argued that rule 37 "was not the basis of the [c]ourt's [July 9, 1997], ruling" and that even if the rule was the basis for the court's order, he "was not obligated to produce a transcript of the telephone conversation prior to ... Johnson's deposition" because the transcript was "protected by the work-product doctrine."

¶ 12 On January 4, 1999, the trial court ruled on the amount Atkin would be required to pay defendants pursuant to the court's July 9, 1997, order. Although the court recognized defendants' evidence demonstrating they had incurred $21,997 of attorney fees and costs in obtaining the order, it denied defendants recovery for these fees and ruled that Atkin pay only $1500 in "sanctions." The court explained:

> With regard to the ... amount of sanctions that should be imposed in this case for the ex parte contact with Roger Johnson by Mr. Atkin ... in accordance with my order of July 9, 1997[,] I don't have any doubt [about] the amount of fees that have been testified to by Defendants' counsel....
>
> I don't doubt that those fees have all been incurred and [the] time has been put in. As I'm confident, they were.
>
> ....
>
> [However,] rule 11 [of the Utah Rules of Civil Procedure] ... does not necessarily mandate that if I find there was a violation that all fees necessarily must be awarded.... [T]he court must exercise some discretion for the purposes that rule 11 has been adopted by the Supreme Court.
>
> ....
>
> And taking that into consideration, and exercising [the] discretion that I believe I am entitled to exercise with regard to the amount of the sanction, and I consider [this] a sanction and not a reimbursement of fees, ... I am not going to require Mr. Atkin to repay the ... $22,000 ... of fees sought by the defendants....
>
> The amount of sanction I'm going to impose is $1500, recognizing the amount of fees incurred [was] substantially more....
>
> Accordingly, the order of July 9, 1997, [will] be supplemented to reflect the amount of sanction that I've imposed here.

Shortly thereafter, on January 29, 1999, the trial court denied both Atkin's February 19, 1998, motion for reconsideration and defendants' cross-motion requesting "additional sanctions" for Atkin's alleged additional ethical violations.[1]

¶ 13 Atkin now appeals the trial court's July 9, 1997, order finding that he violated Utah Rule of Professional Conduct 4.2 and Utah Rule of Civil Procedure 34(b), and the court's subsequent order denying his motion for reconsideration and imposing $1500 in "sanctions."

## ANALYSIS

¶ 14 On appeal, Atkin argues that the trial court erred in finding he violated Utah Rule of Professional Conduct 4.2 because (1) the court exceeded its authority by allowing defendants "to use the Rules [of Professional

---

1. The trial court later memorialized these rulings-along with its January 4, 1999, order that Atkin pay $1500 in sanctions—in a written order dated March 31, 1999.

Conduct] as a tactical weapon," (2) Atkin's conversation with Johnson could not have constituted a violation of rule 4.2 since "Johnson was not a high level corporate employee" of TMS, and (3) Atkin "did not know ... Johnson was represented by [counsel]." Atkin further contends that the trial court erred in ordering him to produce the transcript of his conversation with Johnson pursuant to Utah Rules of Civil Procedure 34 and 37, because the "transcript was protected from production ... by the work-product doctrine." Accordingly, Atkin argues that the trial court's order requiring him to pay $1500 to defendants should be vacated. In addition, defendants assert on cross-appeal that the trial court erred by awarding only $1500 in "sanctions" rather than $21,997 in "costs and fees." We address each issue in turn.

## I. UTAH RULE OF PROFESSIONAL CONDUCT 4.2

### A. Trial Court Authority to Regulate Attorney Misconduct

■ ¶ 15 Atkin raises as an initial matter the question of whether the trial court exceeded its authority in finding he violated Utah Rule of Professional Conduct 4.2. Specifically, Atkin argues that by giving defendants "standing to enforce the Rules of Professional Conduct in the context of litigation," the court impermissibly allowed them "to use the Rules as a tactical weapon."

■ ¶ 16 Despite this argument, Atkin concedes on appeal that courts "obviously can regulate what goes on in the practice." Indeed, we have long held that courts are endowed with the inherent authority to regulate attorney misconduct. As we noted nearly a century ago in *In re Evans:*

It is undoubtedly true that courts of general and superior jurisdiction possess certain inherent powers not derived from any statute. Among these are the power to punish for contempt, to make, modify, and enforce rules for the regulation of the business before the court ..., *to direct and control its officers, including attorneys as such,* and to suspend, disbar, and reinstate attorneys. Such inherent powers of courts are

necessary to the proper discharge of their duties.... [Absent legislative limitations], a constitutional court of general and superior jurisdiction may exercise such inherent powers and summary jurisdiction as the necessity of the case may require, and in manner comporting with a proper discharge of its duties in the premises.

. . . .

That jurisdiction is inherent, continuing, and plenary, and exists independently of statute or rules of equity, and ought to be assumed and exercised ... not only to maintain and protect the integrity and dignity of the court ..., but also to control and protect its officers, including attorneys.

42 Utah 282, 299–300, 130 P. 217, 224–25 (1913) (emphasis added). The inherent power of a court to regulate those practicing before it also encompasses the authority to enforce its regulation through appropriate means, such as by levying monetary sanctions, excluding evidence, or disqualifying counsel from a case. *See, e.g., Griffith v. Griffith,* 1999 UT 78, ¶ 14, 985 P.2d 255 (monetary sanctions for delay, inconvenience, and expenses caused by attorney's behavior); *Barnard v. Wassermann,* 855 P.2d 243, 249 (Utah 1993) (same); *Margulies ex rel. Margulies v. Upchurch,* 696 P.2d 1195, 1204–05 (Utah 1985) (disqualification for ethical violation); *accord, e.g., Camden v. Maryland,* 910 F.Supp. 1115, 1123 (D.Md.1996) ("Faced with gains ill gotten because of impermissible contacts with employees, courts have suppressed the evidence. They have also, in more extreme circumstances, disqualified the attorney or firm that initiated the contact." (citations omitted)). We explained in *Wassermann,* "A court's power to enforce its rules implies the existence of a mechanism for enforcement. That mechanism may take a variety of forms, one example of which is the assessment of attorney fees. Without sanctions, the power to enforce would be meaningless." 855 P.2d at 249; *see also* Utah Code Ann. § 78–7–5 (1996) (instilling in "[e]very court" the power to "control ... the conduct" of all persons involved in a proceeding before it).

¶ 17 Moreover, because "[t]rial courts are usually given broad discretion in controlling the conduct of attorneys in matters before the court," *Margulies,* 696 P.2d at 1199, a court's decision to employ this power operates independently of how the court learns of a potential ethical or other violation. Accordingly, trial courts may correct such violations on their own initiative or in response to the motion of a party. *See* 7A C.J.S. *Attorney & Client* § 95, at 38 (1980) ("The court, learning of professional misconduct of attorneys, may institute ... proceedings, of its own motion, without waiting for a specific complaint, or it may direct some attorney to draw up the accusation and prosecute the case, or it may refer the matter to the appropriate ... standing committee of the bar."). As we held in *Margulies,* trial courts may disqualify a law firm from a matter in which the firm has a conflict of interest, even if the conflict is brought to the trial court's attention by the opponent of the party represented by the firm. 696 P.2d at 1198, 1204. In fact, even when there are concerns that such disqualification motions are being "misused for tactical advantage in litigation," those concerns may be outweighed by the "appearance of impropriety ... coupled with violations of the Code of Professional Responsibility" present in the case. *Id.* at 1204–05.

¶ 18 Applying these principles to the case at hand, it becomes clear that the trial court did not exceed its authority by addressing, "in the context of litigation," whether Atkin violated rule 4.2. This court's case law unambiguously recognizes that trial courts possess the inherent authority not only to find violations of their rules or the ethics code, but also to impose appropriate remedies for the enforcement of those rules. *See Griffith,* 1999 UT at ¶ 14, 985 P.2d 255; *Wassermann,* 855 P.2d at 249; *Margulies,* 696 P.2d at 1204–05. Our decisions further dictate that a court's authority in this regard is unmitigated by challenges to the source of information on which the court ultimately acts; a trial court's exercise of its power to regulate those appearing before it is within the court's discretion, and it is irrelevant whether a trial court finds a violation on its own motion or on that of a party. *See id.* at 1198, 1204. As a result, Atkin's argument that the trial court

exceeded its authority by making its finding in response to defendants' motion must fail. Indeed, to hold otherwise would reduce the Rules of Professional Conduct to near uselessness, for it would bind the "inherent powers" of judicial regulation by allowing attorneys who have violated the ethics code to hide behind the guise that only the state bar association may enforce the rules. Such a result would fly in the face of our repeated reminders that courts must "maintain and protect the integrity and dignity" of the profession, and we will not render it here. *In re Evans,* 42 Utah at 300, 130 P. at 225.

### B. Representation

¶ 19 Asserting that "Johnson was not a high level corporate employee" of TMS, Atkin next challenges the trial court's determination that he violated rule 4.2. Specifically, Atkin argues that to qualify as represented by a corporation's counsel for purposes of rule 4.2, employees must have "managerial responsibilities and ... the legal authority to 'bind' the corporation in a legal evidentiary sense." Thus, Atkin contends further, Johnson was not a "represented party" at the time of their May 10, 1993, conversation, because Johnson was merely the "secretary-treasurer of the corporation, [and] such position is not sufficient to create binding authority."

¶ 20 Trial courts are typically afforded broad discretion in assessing the ethical violations of attorneys practicing before them. *Margulies,* 696 P.2d at 1199. However, because this court possesses "a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited" to the extent its decision implicates only the "legal and ethical significance" of the violation in dispute. *Houghton v. Dep't of Health,* 962 P.2d 58, 61 (Utah 1998); *see also Cheves v. Williams,* 1999 UT 86, ¶ 57, 993 P.2d 191; *State v. Pena,* 869 P.2d 932, 936–38 (Utah 1994). At the same time, trial courts enjoy a greater degree of discretion when it is necessary to resolve factual disputes, since such a tribunal "is naturally in a better position to consider and weigh all th[e] circumstances in their application to the legal standard at issue." *Hough-*

*ton,* 962 P.2d at 61. In this case, Atkin's argument that a "secretary-treasurer" of a corporation does not qualify as a represented person for the purposes of rule 4.2 is a legal question, and we consequently "accord little deference to the trial court in its decision" on this point. *Id.* Conversely, Atkin's contention, addressed below, that he "did not know" Johnson was represented by counsel is by definition a factual dispute, and we therefore grant the trial court broad discretion in our review of that issue on appeal. *See id.*

¶ 21 As applicable here,[2] Utah Rule of Professional Conduct 4.2 prohibits a lawyer from communicating

> about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer . . . to do so.

Utah R. Prof'l Conduct 4.2 (1993). This rule reflects Utah's adoption of the American Bar Association's ("ABA") Model Rule of Professional Conduct 4.2, which was originally derived from the ABA's Canon of Professional Ethics 9. Although the policy goals of this rule have evolved over time,[3] the "general thrust of the rule [today] is to prevent situations in which a represented party may be taken advantage of by adverse counsel." *Wright ex rel. Wright v. Group Health Hosp.,* 103 Wash.2d 192, 691 P.2d 564, 567 (1984).

¶ 22 Yet despite the clarity of the rule's goal, the question of how to properly interpret rule 4.2—particularly in regard to the scope of the term "party"—has created considerable controversy within the legal profession, and courts have enunciated a variety of tests to generate their answers. *See, e.g., Pub. Serv. Elec. & Gas Co. v. Associated Elec. & Gas Ins. Servs. Ltd.,* 745 F.Supp.

1037, 1042 (D.N.J.1990) (applying the ex parte communication ban to all corporate employees); *Mompoint v. Lotus Dev. Corp.,* 110 F.R.D. 414, 418 (D.Mass.1986) (employing a balancing approach); *Fair Auto. Repair, Inc. v. Car–X Serv. Sys., Inc.,* 128 Ill.App.3d 763, 84 Ill.Dec. 25, 471 N.E.2d 554, 560–61 (1984) (adopting a "control group" test); *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030, 1035 (1990) (following a "speaking authority" analysis). *See generally* Stephen M. Sinaiko, Note, *Ex Parte Communication and the Corporate Adversary: A New Approach,* 66 N.Y.U. L.Rev. 1456, 1481–95 (1991) (analyzing four different categories of tests adopted by courts).

¶ 23 In this case, however, we are required neither to adopt any particular jurisdiction's analysis nor to navigate the merits and pitfalls of the possibilities. The official comment to Utah Rule of Professional Conduct 4.2 explains that where the represented party at issue is a corporation or other such organization, the rule

> prohibits communications by a lawyer for one party concerning the matter in representation with [1] persons having a managerial responsibility on behalf of the organization, and with [2] any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or [3] whose statement may constitute an admission on the part of the organization.

Utah R. Prof'l Conduct 4.2 cmt. (1993). Accordingly, the question at issue here is whether Johnson's status as secretary and treasurer of TMS made rule 4.2 applicable to his May 10, 1993, conversation with Atkin due to his "managerial responsibility" within

---

**2.** Subsequent to Atkin's conversation with Johnson on May 10, 1993, rule 4.2 was repealed, reenacted, and amended. However, we apply the law as it existed at the time of the violation charged, and we thus apply rule 4.2 as in effect in 1993. *State v. Redd,* 1999 UT 108, n. 4, 992 P.2d 986; *see also Airport Hilton Ventures, Ltd. v. Utah State Tax Comm'n,* 1999 UT 26, n. 1, 976 P.2d 1197.

**3.** *Compare, e.g.,* ABA Comm. on Prof'l Ethics and Grievances, Formal Op. 108 (1934) (explaining

that the purpose of Canon 9 was to preserve the proper functioning of the legal system and to shield adverse parties from improper approaches), *with* Note, *DR 7–104 of the Code of Professional Responsibility Applied to the Government "Party",* 61 Minn. L.Rev. 1007, 1010 (1977) (asserting that the purpose of the rule was to avoid diminishment of contingent fees by preventing attorneys from settling directly with the clients of adverse attorneys).

the organization, his ability to impute liability to TMS by "act or omission in connection with th[e] matter" in dispute, or his ability to make an evidentiary "admission on the part of the organization." *Id.; see also* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 95–396 (1995) ("The Comment to Rule 4.2 ... makes plain that the term represented party refers not only to those with managerial responsibilities but to anyone who may legally bind the organization with respect to the matter in question.").[4]

¶ 24 Typically, a corporation's secretary or treasurer cannot bind the company through declarations unless they are combined with an authorized act. *Foster v. Blake Heights Corp.,* 530 P.2d 815, 818 (Utah 1974); *Aggeller & Musser Seed Co. v. Blood,* 73 Utah 120, 130, 272 P. 933, 936 (1928); *see also Lloydona Peters Enters., Inc. v. Dorius,* 658 P.2d 1209, 1211 (Utah 1983); 2A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 744 (perm. ed.1992) [hereinafter *Fletcher Cyclopedia of Corporations* ]. However, when such declarations are made in the course of business entrusted by the corporation to the secretary or treasurer, they are binding. *Sweatman v. Linton,* 66 Utah 208, 214, 241 P. 309, 314 (1925); *Utah Foundry & Mach. Co. v. Utah Gas & Coke Co.,* 42 Utah 533, 546, 131 P. 1173, 1178 (1912); *see also Continental Nat'l Bank of Salt Lake City v. Minersville Reservoir & Irrigation Co.,* 73 Utah 243, 253, 273 P. 502, 506 (1928); *Fletcher Cyclopedia of Corporations, supra.* As a result, if during their May 10, 1993, conversation Atkin questioned Johnson about matters included within the scope of his duties as secretary and treasurer of TMS, then Johnson's responses carried the possibility of imputing liability to TMS, thus making rule 4.2 applicable under the official comment's second prong for determining whether a corporate employee is "represented" under the rule.

¶ 25 In Utah, the scope of a secretary's duties may encompass stock issuance, *see* Utah Code Ann. § 16–10a–625(4)–(6) (1999), and in this case, the primary subject of the underlying dispute was the corporation's refusal to issue Featherstone stock. Indeed, the record on appeal reflects that TMS had drawn up a stock certificate of 429 shares made out to "Stephen R. Featherstone," and awaiting the signatures of "Grant S. Schaerrer" as "President" and "Roger D. Johnson" as "Secretary" of the corporation. The transcript of Atkin's conversation with Johnson further reflects not only that stock issuance was the primary matter in dispute, but also that Atkin specifically questioned Johnson about TMS's decisions concerning stock issuance. For example, Atkin queried:

And was it, was the business going to be set up as a corporation from the beginning?

. . .

And were shares going to be issued to you, Paul, Grant, and Steve?

. . .

Do you know why the shares in the corporation were never issued?

Accordingly, we hold that because during their May 10, 1993, conversation Atkin questioned Johnson about the matter in dispute—a matter for which Johnson's responses could have imputed liability to TMS as within his duties as secretary for the corporation—the trial court correctly concluded that rule 4.2 applied to the conversation. *See* Utah R. Prof'l Conduct 4.2 cmt. (1993). TMS had retained counsel to represent the corporation in Featherstone's suit prior to May 10, and Johnson was therefore represented by that counsel as secretary of the corporation at the time of his conversation with Atkin.

### C. Knowledge of Representation

¶ 26 Finally, contending that he "did not know ... Johnson was represented by [counsel]" when Johnson telephoned him on May 10, 1993, Atkin challenges the trial

4. If the current version of rule 4.2 applied to this case, any possible need for the clarification provided by the official comment to the 1993 version of the rule would be removed. The current rule would clearly find Johnson a "represented party," because it holds members of a corporation's "control group" to be " 'represented' by counsel for the organization if the individual is not separately represented," and the control group includes "the chair of the organization's governing body, president, treasurer, and secretary." Utah R. Prof'l Conduct 4.2(c) (2001).

court's determination that he violated rule 4.2. In support of this contention, Atkin urges that because "it never occurred to [defendants' attorney] during ... Johnson's deposition [and] ... after four years of discovery ... that he might, as a lawyer for the corporation, enjoy an attorney-client relationship" with Johnson, then it "cannot possibly be found that [Atkin] ... should have known" Johnson was represented by corporate counsel when he received the phone call from Johnson in 1993.

■ ¶ 27 To find that a lawyer has engaged in an inappropriate ex parte communication, rule 4.2 requires that the lawyer "knows" the party "to be represented by another lawyer in the matter" at the time of the communication. Utah R. Prof'l Conduct 4.2 (1993). The Utah Rules of Professional Conduct further define "knows" to mean "actual knowledge of the fact in question." Utah R. Prof'l Conduct (terminology) (1993). However, "A person's knowledge may be inferred from circumstances." *Id.*

¶ 28 Taking this definition of "knows" into consideration, it becomes clear that Atkin's argument that he "did not know ... Johnson was represented by [counsel]" at the time of their conversation is meritless. Atkin's contention that we should impute to his state of mind on May 10, 1993, the knowledge, or lack thereof, of opposing counsel nearly four years later is entirely unsupported by rule 4.2. While the Rules do allow a tribunal to infer a "person's knowledge ... from circumstances," nowhere do they indicate that the mindset of one attorney may explain what knowledge an entirely different person possesses. To the contrary, rule 4.2 and its related provisions define knowledge only in terms of the specific attorney at issue: Rule 4.2 prohibits "a lawyer" from communicating "about the subject of the representation with a party *the lawyer* knows to be represented," Utah R. Prof'l Conduct 4.2 (1993) (emphasis added), and "knows" is defined as "actual knowledge" in terms of that "person's knowledge," not "someone else's knowledge." Utah R. Prof'l Conduct (terminology) (1993).[5] Indeed, Atkin never argues that he did not know Johnson was represented by counsel,[6] only that it "cannot possibly be found that [he] ... should have known" since the existence of that relationship "never occurred" to defendants' counsel four years later.

¶ 29 Moreover, the record on appeal demonstrates that the trial court possessed sufficient evidence to find that Atkin knew Johnson was represented, as secretary of TMS, by the corporation's counsel at the time of their May 10, 1993, conversation. Atkin filed Featherstone's complaint, which named TMS as a defendant, nearly a month earlier, on April 16, 1993, and that complaint included as attachments two letters indicating that defendants' counsel had "been retained to represent the interests of Thermo Mechanical Sales Inc." in connection with the dispute over Featherstone's alleged ownership in the corporation. Likewise, on April 29, 1993—nearly two weeks prior to Atkin's May 10 conversation with Johnson—counsel for TMS served on Atkin defendants' first request for

5. In addition, even if Atkin's argument were tenable, he cites no evidence indicating, as he asserts, that "it never occurred to [defendants' counsel] during Johnson's deposition ... that he ... enjoy[ed] an attorney-client relationship" with Johnson at the time of Johnson's conversation with Atkin. In fact, defendants' counsel engaged in a line of questioning during Johnson's deposition that demonstrated it may very well have "occurred to him" that the conversation constituted an ethical violation on Atkin's part due to Johnson's representation by corporate counsel at the time. Upon learning of the transcript of that conversation, defendants' counsel asked Atkin whether the conversation took place "before or after this lawsuit was filed," "after you named [Johnson] as a defendant or before," and whether they "discussed the subject of this lawsuit."

6. Atkin does argue that he believed TMS to be "a partnership of which the corporation was merely a shell without substance," and Johnson to be simply a "junior partner" while Burt, Featherstone, and Schaerrer were the "principal partners." However, even if TMS had not incorporated and even if Atkin had not been aware of the company's incorporation, this argument would be unavailing. Johnson still would have been represented by TMS's counsel as an agent for the partnership. Utah law clearly states: "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner ... binds the partnership...." Utah Code Ann. § 48–1–6(1) (1998).

production of documents. Atkin also concedes on appeal that "[t]he public records of the corporation showed Mr. Johnson as secretary/treasurer of the corporation." In addition, the transcript of Johnson's deposition further demonstrates Atkin's knowledge concerning Johnson's representation on May 10, 1993. In that deposition, Atkin admitted both that he had "discussed the subject of this lawsuit" with Johnson during their conversation, and that Johnson had informed Atkin he had not retained personal counsel in the matter. Together, this evidence demonstrates Atkin knew (1) that TMS was represented by counsel; (2) that Johnson was not represented by his own, independent counsel; and (3) that Johnson was serving as secretary and treasurer of TMS.

¶ 30 Accordingly, we hold that the trial court did not abuse its discretion in determining that Atkin violated Utah Rule of Professional Conduct 4.2 by engaging in an ex parte communication with a represented party. Not only is another person's lack of information or understanding wholly irrelevant to whether an attorney "knows" a party to be represented for purposes of rule 4.2, but the trial court possessed an adequate foundation upon which to determine Atkin knew Johnson was represented, as secretary and treasurer of TMS, by counsel for the corporation at the time of their conversation on May 10, 1993.[7]

7. Despite the court's correctly finding Atkin violated Utah Rule of Professional Conduct 4.2, defendants assert on cross-appeal that the court erred by failing to find Atkin had committed additional violations of the ethical rules, and thus, by failing to award "additional sanctions" against him. However, as explained above, while courts of general jurisdiction have the authority to regulate attorney misconduct, it is within their "broad discretion" to "control[ ] the conduct of attorneys in matters before the court," especially where factual assessments are necessary to the determination of such violations. *Margulies ex rel. Margulies v. Upchurch*, 696 P.2d 1195, 1199 (Utah 1985); *see also Houghton v. Dep't of Health*, 962 P.2d 58, 61 (Utah 1998); *In re Evans*, 42 Utah 282, 299–300, 130 P. 217, 224–25 (1913). Moreover, the trial court in this case never used Atkin's violation of rule 4.2 as a basis for awarding sanctions. Rather, the court excluded use of the transcript during the trial because of Atkin's unethical means of obtaining the conversation to which it referred, and awarded costs and attorney fees pursuant to Utah Rule of

## II. ATTORNEY WORK PRODUCT IMMUNITY

¶ 31 Atkin next challenges the trial court's July 9, 1997, order requiring him to pay $1500 to defendants and compelling discovery in accordance with Utah Rule of Civil Procedure 37(a) and the court's determination that Atkin violated Utah Rule of Civil Procedure 34(b) by withholding the transcript of his conversation with Johnson despite defendants' requests that he produce the document. Upon finding that Atkin violated rule 34(b) by improperly withholding the transcript, the court ordered Atkin to pay "costs and legal fees incurred" pursuant to Utah Rule of Civil Procedure 37(a)(4), which states that a "court shall . . . require the party[, deponent, or attorney] whose conduct necessitated the motion [to compel] . . . to pay to the moving party the reasonable expenses incurred in obtaining the order [compelling production], including attorney fees," unless the opposition to the motion "was substantially justified . . . or other circumstances make an award of expenses unjust." Utah R. Civ. P. 37(a)(4) (1993).[8] Atkin argues on appeal that the trial court erred in ordering him to pay "costs and legal fees incurred," as he did not violate rule 34(b) because the transcript of his conversation with Johnson "was pre-

Civil Procedure 37(a)(4). Accordingly, being mindful of the trial court's unique position in assessing and managing the conduct of the attorneys practicing before it—and noting that it never awarded sanctions for such violations in this suit—we defer to the lower court's judgment and decline to upset its decision not to enter findings of additional ethical violations against Atkin. If defendants believe Atkin committed ethical violations that require additional attention, they may take up the matter with the appropriate body, the Utah State Bar Association's Office of Professional Conduct. *See* Utah R. Law. Discipline & Disability 10(a).

8. This rule was subsequently amended to require the party against whom the order compelling production was issued to pay expenses unless the movant did not first make a "good faith effort to obtain the disclosure or discovery without court action," the nonmoving party's nondisclosure was "substantially justified," or "other circumstances make an award of expenses unjust." Utah R. Civ. P. 37(a)(4)(A) (2001).

pared in anticipation of litigation and to assist in trial preparation," and thus, "was protected from production . . . by the work-product doctrine." We review a court's award of costs and attorney fees under rule 37(a)(4) for an abuse of discretion. *See Garrand v. Garrand*, 581 P.2d 1012, 1014 (Utah 1978); *see also Affleck v. Third Judicial Dist. Court*, 655 P.2d 665, 667 (Utah 1982) (per curiam).[9]

 ¶ 32 Atkin correctly notes that certain materials otherwise subject to discovery are, upon appropriate objection, protected from disclosure and introduction into evidence because of their creation by an attorney in preparation for litigation. Specifically, Utah Rule of Civil Procedure 26(b)(3) immunizes from production "otherwise discoverable" evidence that qualifies as attorney work product—materials that qualify as (1) "documents and tangible things," (2) "prepared in anticipation of litigation or for trial," (3) "by or for another party or by or for that other party's representative." Utah R. Civ. P. 26(b)(3) (1993).

 ¶ 33 However, attorney work product immunity "is not absolute." *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589, 590 (Utah 1997). The work product privilege derives from dual policy goals aimed at "preserving the adversary system" and "providing attorneys with a zone of privacy permitting effective client advocacy," *id.*, and it thus follows that to the extent these goals are trampled on, the scope of the attorney work product privilege may be eroded. *See id.* (recognizing exceptions to the privilege for malpractice suits and "advice of counsel" defenses because enforcing

work product immunity in such cases would run contrary to the policy objectives of the doctrine).

¶ 34 Although this court has not been presented with the opportunity to exhaustively address the precise circumstances and exigencies requiring such erosion, numerous courts in other jurisdictions have recognized one set of conditions under which the privilege becomes limited: when attorneys engage in unethical behavior to obtain the evidence at issue. *See, e.g., Parrott v. Wilson*, 707 F.2d 1262, 1271–72 (11th Cir.1983); *Moody v. IRS*, 654 F.2d 795, 800–01 (D.C.Cir.1981); *Anderson v. Hale*, 202 F.R.D. 548, 554–55, 2001 U.S. Dist. LEXIS 4994, at *18 (N.D.Ill.2001); *Wilson v. Lamb*, 125 F.R.D. 142, 143 (E.D.Ky.1989); *Haigh v. Matsushita Elec. Corp. of America*, 676 F.Supp. 1332, 1357–58 (E.D.Va.1987). As the D.C. Circuit held in *Moody v. IRS*, "[A] lawyer's unprofessional behavior may vitiate the work product privilege." 654 F.2d at 800. The court reasoned that this exception to the privilege is necessary because "perverse" results would be rendered if lawyers could "claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent." *Id.* In such cases,

> Non-disclosure would then provide an incentive for, rather than against, the disfavored practices. The integrity of the adversary process is not furthered by protecting a lawyer who steps outside his role as "an officer of the court . . . work[ing] for the advancement of justice while faithfully protecting the rightful interests of his clients." An attorney

---

9. Atkin further contends that he was "entitled" to withhold the transcript until Johnson's deposition was completed. However, although courts enjoy the discretion to defer disclosure of a statement until after the deposition of the party who gave the statement has been completed, the party seeking deferral of disclosure "has the burden of seeking an order of the Court to that effect," and failure to do so constitutes waiver. *Willard v. Constellation Fishing Corp.*, 136 F.R.D. 28, 30 (D.Mass.1991); *see also Torres–Paulett v. Tradition Mariner, Inc.*, 157 F.R.D. 487, 489 (S.D.Cal. 1994) (holding that a party had not waived its right to withhold disclosure because it had properly filed a motion for a protective order prior to the deposition in question); Utah R. Civ. P.

26(b)(3) (1993) ("A party may obtain without the required showing a statement concerning the action or its subject matter previously made by that party."). Here, Atkin not only failed to move for a protective order prior to Johnson's deposition, but he also entirely failed to identify the transcript prior to the deposition despite defendants' requests for documents on both April 29, 1993, and November 19, 1996. As such, he waived any possible right to delay disclosure until after the deposition's completion. *Willard*, 136 F.R.D. at 31 ("[B]y failing to file a motion for a protective order deferring discovery of the statement until after plaintiff's deposition, the defendant is not entitled to defer the disclosure of the statement.").

should not be able to exploit the privilege for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends.

*Id.* (footnotes omitted) (quoting *Hickman v. Taylor,* 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). Indeed, we have repeatedly admonished that, as officers of the court, attorneys must stand as vanguards for the integrity of the judicial process and the dignity of the profession. *See, e.g., In re Utah State Bar Petition,* 647 P.2d 991, 993 (Utah 1982); *In re McCullough,* 97 Utah 533, 558, 95 P.2d 13, 24 (1939); *In re Evans,* 42 Utah 282, 300, 130 P. 217, 225 (1913); *McWhirter v. Donaldson,* 36 Utah 293, 304, 104 P. 731, 735 (1909); *In re Snow,* 27 Utah 265, 272, 75 P. 741, 744 (1904); *see also Griffith v. Griffith,* 1999 UT 78, ¶ 13, 985 P.2d 255; *Barnard v. Wassermann,* 855 P.2d 243, 249 (Utah 1993); Utah R. Prof'l Conduct (preamble) (2001). In view of this role—and in line with our recognition of the need to "preserv[e] the adversary system" as a primary rationale for allowing work product immunity in the first place, *Uno,* 932 P.2d at 590—we find the reasoning of the D.C. Circuit's decision in *Moody* persuasive and adopt it here.

¶ 35 Accordingly, in situations where a court has determined that an attorney asserting work product immunity committed an ethical violation in obtaining the evidence at issue, the court must determine any applicable work product privilege vitiated and thus order disclosure of the evidence so long as the disclosure would not "traumatize the adversary process more than the underlying legal misbehavior." *Moody,* 654 F.2d at 801; *see also Parrott,* 707 F.2d at 1272 (ordering disclosure of clandestinely recorded conversations with witnesses because the only effect of such disclosure would be "the playing of the taped conversations" at the beginning of the witnesses' depositions); *Hale,* at 554–55, 2001 U.S. Dist. LEXIS 4994, at *18 (following *Parrott* ); *Lamb,* 125 F.R.D. at 143 (same); *Haigh,* 676 F.Supp. at 1357–58 (same).

¶ 36 In this case, we have already determined that the trial court appropriately found Atkin to have violated Utah Rule of Professional Conduct 4.2 by engaging in an ex parte conversation with a represented party concerning the dispute underlying this appeal. *See supra* ¶¶ 19–30. Indeed, it was only through this unethical conduct that Atkin was able to obtain, record, and transcribe his illicit conversation with Johnson at all; had Atkin properly deposed Johnson rather than inappropriately communicating with him about the matter in dispute before first contacting his attorney, then Johnson would have been entitled to receive a transcript of the proceeding as mandated by Utah procedure and law. Utah R. Civ. P. 30(f)(3) (2001). As a result, no legitimate argument can be made that Atkin's unethical behavior did not vitiate whatever work product privilege may have been applicable to the transcript of Atkin's May 10, 1993, conversation with Johnson. Not only was it Atkin's unethical behavior that allowed him to obtain the transcript, but disclosure of the transcript could not possibly have "traumatize[d] the adversary process more than the underlying legal misbehavior." *Moody,* 654 F.2d at 801. In fact, the trial court ordered that the transcript not "be referred to or used in th[e] litigation." Consequently, disclosure could only protect the adversary process by restoring the playing field to its position prior to Atkin's actions. In other words, by ordering disclosure of the transcript, the trial court merely corrected the harm done to the adversary system when Atkin took an unfair advantage by unethically dealing with his client's opponent before seeking—or receiving—permission from the opponent's counsel to do so. *See* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2027, at 411 & n. 11 (1994) (noting that the objectives of work product immunity are not advanced when one party uses unfair practices to gain an advantage in the proceedings).

¶ 37 Therefore, we hold that "whatever work product privilege might have existed [as to the transcript] was vitiated" by Atkin's unethical methods used to engage in the conversation with Johnson. *Parrott,* 707 F.2d at 1272. As a consequence, the trial court did not abuse its discretion in ruling that Atkin violated Utah Rule of Civil Proce-

dure 34(b) when he failed to produce the transcript, and thus, in ordering Atkin to pay costs and attorney fees associated with defendants' motion to compel pursuant to Utah Rule of Civil Procedure 37(a). Those expenses, in addition to the court's unchallenged [10] award for the reasonable expenses defendants incurred in defending against Atkin's motion to compel Johnson's deposition, *see* Utah R. Civ. P. 37(a)(4) (1993) ("If [a] motion [to compel] is denied, the court shall ... require the moving party or the attorney ... or both of them to pay to the [prevailing] party or deponent ... the reasonable expenses incurred in opposing the motion, including attorney fees ...."), shall be paid to defendants by Atkin following remand.

## III. COSTS AND ATTORNEY FEES

■ ¶ 38 Having determined that the trial court properly ordered Atkin to pay defendants their reasonable costs and attorney fees incurred in pursuing their motion to compel production of the transcript—in addition to their reasonable expenses for defeating Atkin's motion to compel Johnson's deposition—we now turn to defendants' argument made on cross-appeal that the trial court abused its discretion by awarding only $1500 in "sanctions" rather than $21,997 in "costs and fees" pursuant to its July 9, 1997, order.[11]

¶ 39 As explained above, upon granting a motion to compel, Utah Rule of Civil Procedure 37(a)(4) requires the trial court to award the moving party its "reasonable expenses incurred in obtaining the order, including attorney fees." Utah R. Civ. P. 37(a)(4) (1993). Such expenses must also be awarded to the nonmoving party who suc-

cessfully defends against a motion to compel. *Id.*

¶ 40 In this case, defendants submitted to the trial court that they had incurred $21,997 in costs and attorney fees in "addressing Atkin's ethical and discovery violations." However, when the court conducted its hearing to determine what costs and fees Atkin would be required to pay in accordance with the court's July 9, 1997, order, the court repeatedly noted that it had decided to impose a Utah Rule of Civil Procedure 11 sanction on Atkin rather than requiring him to pay the "reasonable expenses incurred ..., including attorney fees," in connection with the discovery dispute. Utah R. Civ. P. 37(a)(4) (1993). The court stated,

> I consider [this award] a sanction and not a reimbursement of fees.

Accordingly, the court found that it did not need to determine what fees were reasonably incurred, since rule 11 does not require such an assessment: "I don't doubt that [the fees submitted] have all been incurred and the time has been put in, [but] rule 11 ... does not necessarily mandate that if I find there was a violation that all fees necessarily must be awarded." The court therefore concluded that Atkin would be required to pay a sanction that was admittedly less than the costs and fees defendants attested they had incurred: "The amount of sanction I'm going to impose is $1500, recognizing the amount of fees incurred [was] substantially more...."

¶ 41 In so ordering, the court abused its discretion by applying the wrong legal standard in determining the costs and attorney fees owed by Atkin to defendants for their efforts in obtaining the July 9, 1997, order related to the discovery disputes over the

---

**10.** Nowhere on appeal does Atkin challenge the trial court's denial of his motion to compel Johnson's deposition. Moreover, the only argument on which Atkin's motion below was based—that he had a general right to withhold the transcript until Johnson's deposition was completed—is entirely unfounded. Atkin clearly waived any possible right to delay disclosure by failing to move for a protective order *prior* to Johnson's deposition. *See supra* note 9; *Willard v. Constellation Fishing Corp.*, 136 F.R.D. 28, 30 (D.Mass.1991).

**11.** Defendants also urge us to award their expenses incurred on appeal, primarily based on their assertion that "Atkin makes what amounts

to an appeal that is 'not grounded in fact.'" (quoting Utah R.App. P. 33 (2001)). However, defendants provide no concrete reason or legal analysis for our granting such an award, and we accordingly exercise our discretion in denying their request. *See, e.g., State v. Bishop*, 753 P.2d 439, 450 (Utah 1988) (reminding that this court " 'is not simply a depository in which the appealing party may dump the burden of argument and research' " (quoting *Williamson v. Opsahl*, 92 Ill.App.3d 1087, 48 Ill.Dec. 510, 416 N.E.2d 783, 784 (1981))); *see also MacKay v. Hardy*, 973 P.2d 941, 948 n. 9 (Utah 1998). Each party shall bear its own expenses on appeal.

transcript and Johnson's deposition. Rule 37(a)(4) plainly and unambiguously requires that a court "shall" order the losing party "to pay ... the reasonable expenses incurred in obtaining the order, including attorney fees." *Id.* Here, however, the trial court specifically declined to make such a determination, opting instead to award sanctions under rule 11. But the standard imposed by rule 11 is entirely separate and different from the standard used for determining costs and fees under rule 37; under rule 11 the trial court is not *required* to assess *costs and fees,* but is *allowed* to award *sanctions* only to the extent necessary "to deter repetition of [the inappropriate] conduct or comparable conduct by others similarly situated." Utah R. Civ. P. 11(c)(2) (2001). Moreover, the court simply could not have imposed rule 11 sanctions against Atkin, because the court never found he had violated rule 11, nor was Atkin ever afforded the due process required under rule 11 allowing him "adequate notice and an opportunity to respond" to the possibility of a rule 11 sanction. *Gildea v. Guardian Title Co. of Utah,* 2001 UT 75, ¶ 12, 31 P.3d 543; *see also* Utah R. Civ. P. 11(c) (2001).

¶ 42 Consequently, we hold that the trial court erred in ordering Atkin to pay defendants $1500 in sanctions rather than their reasonable costs and attorney fees, and we thus remand for further proceedings on the issue of what costs and fees defendants reasonably incurred in obtaining the court's order compelling production of the ex parte conversation transcript and denying Atkin's motion to compel Johnson's deposition. On remand, the trial court shall apply the correct and appropriate standard for determining such costs and fees, awarding defendants only their "reasonable expenses incurred ...', including attorney fees," in obtaining the July 9, 1997, order compelling production of the transcript and denying Atkin's motion to compel the deposition. Utah R. Civ. P. 37(a)(4) (1993). Moreover, to assist the trial court in this assessment, defendants shall submit by affidavit a detailed account describing specifically what costs and fees they incurred, including a description of the services performed and the times and rates in regard to each service, in obtaining the July 9, 1997, order.[12]

## CONCLUSION

¶ 43 We conclude that the trial court did not abuse its discretion in finding Atkin had violated Utah Rule of Professional Conduct 4.2 by engaging in an ex parte conversation with a represented party. We therefore further conclude that the trial court did not abuse its discretion in awarding defendants their reasonable costs and attorney fees incurred in obtaining the court's order compelling production of the transcript of the conversation and denying Atkin's motion to compel Johnson's deposition; any such work product privilege that may have precluded production was vitiated by the unethical behavior Atkin employed to obtain the transcript. However, we hold that the trial court abused its discretion in calculating the costs and fees owed to defendants by applying the standard for "sanctions" under Utah Rule of Civil Procedure 11 rather than the standard for "costs and fees" under Utah Rule of Civil Procedure 37(a)(4). Accordingly, we (1) affirm the trial court's July 9, 1997, order finding Atkin to have committed ethical and discovery violations, and thus, awarding defendants their costs and fees in obtaining the order, but (2) reverse the trial court's subsequent calculation of such expenses under the rule 11 "sanctions" standard and remand for further proceedings consistent with this opinion.

¶ 44 Justice DURHAM and Judge GREENWOOD concur in Associate Chief Justice RUSSON'S opinion.

¶ 45 Judge ORME concurs in the result.

HOWE, Chief Justice, concurring:

¶ 46 I concur. I share the trial court's skepticism that it reasonably required nearly

---

12. Although we hold that the trial court applied an incorrect legal standard in awarding sanctions rather than costs and fees, we recognize that the court apparently viewed with some skepticism defendants' assertion that they had incurred nearly $22,000 of costs and fees in obtaining a single order, stating, "I think it could have

been done without imposing or incurring those types of fees." Accordingly, because the trial court is required on remand to determine what expenses defendants reasonably incurred in obtaining the July 9, 1997, order, we remind that the court is entitled to demand adequate proof demonstrating such expenses.

$22,000 of costs and fees by the defendants to obtain the discovery order. I agree with the trial court's observation that "I think it could have been done without imposing or incurring those types of fees."

¶ 47 The sizeable request made by defendants reinforces the observation that soon only the wealthy will be able to afford to litigate in the judicial system. The fees sought here might be reasonable following a lengthy trial, but not to pursue and obtain a discovery order. It is simply non-economical to do so. I believe trial judges must closely scrutinize requests for attorney fees to determine that not only the hourly rate is reasonable, but the attorney's time has been used economically on the task. It is not enough that the number of hours claimed to have been spent was actually spent. Otherwise, runaway fees will send more and more litigants into bankruptcy and make the court a forum where only the wealthy can participate.

¶ 48 Judge ORME concurs in the reasoning of Chief Justice HOWE'S concurring opinion.

¶ 49 Having disqualified themselves, Justice DURRANT and Justice WILKINS do not participate herein; Court of Appeals Judges PAMELA T. GREENWOOD and GREGORY K. ORME sat.